Judith BRODERICK, parent and
guardian of J.S.J., a minor
child, Appellant,

v.

KING'S WAY ASSEMBLY OF GOD
CHURCH, Shirley Gilman, and
Does I–V, Appellees.

No. S–3261.

Supreme Court of Alaska.

March 29, 1991.

Dale J. Walther, Clark, Walther & Flanigan, Anchorage, and Gary Divis, Gamliel & Gendelman, New York City, for appellant.

Monica Jenicek, Stone, Waller & Jenicek, Anchorage, for appellee Gilman.

Sanford M. Gibbs, Hagans, Brown, Gibbs & Moran, and Daniel T. Quinn, Richmond & Quinn, Anchorage, for appellee King's Way Assembly of God Church.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Judith Broderick appeals from the superior court's grant of summary judgment in favor of the defendants in Broderick's damage action against Shirley Gilman and King's Way Assembly of God Church for

the alleged sexual abuse of Broderick's daughter. We reverse.[1]

# I

## A

In 1983 Judith Broderick and Gene Jansen, then married, attended King's Way Assembly of God Church. While attending church services, they left their three-year-old daughter, J.S.J., in the church's "tiny tots" program,[2] under the care of Sue McNiece. In mid–1983 Shirley Gilman replaced McNiece. Gilman generally had at least one assistant when she supervised the program.

Shortly after Gilman replaced McNiece, Broderick observed behavioral changes in J.S.J. She noted that J.S.J. no longer wanted to attend "tiny tots" and would scream, kick and cry as they approached the church and the classroom. Broderick noted red rashes on J.S.J.'s elbows and behind her knees. Broderick also observed that J.S.J. was reluctant to take her panties off in front of Broderick and that J.S.J. complained that her genitals hurt when she bathed and used the toilet.

In February 1984 Broderick and Jansen divorced. The following month, Hans Dieter Polak moved in with Broderick and her two children. Broderick and Polak did not regularly attend King's Way Church.

On March 25 and April 8, 1984, Jansen, exercising his visitation rights, took J.S.J. to the church. Each time Jansen dropped J.S.J. off at "tiny tots," she protested and stated that "[she did not] want to go in there." After the March 25 church visit, Broderick noticed that J.S.J.'s panties were spotted with blood. After the April 8 visit, Broderick noticed blood on J.S.J.'s panties and in the toilet after J.S.J. had difficulty with her bowel movement. Broderick called the emergency room at Humana

Hospital and spoke with a nurse, who thought J.S.J. "might have been constipated and ruptured something." J.S.J. was not taken to the hospital or to a doctor as a result of either of these incidents.

On June 21, 1984, Broderick and Polak watched the ABC news program *20/20*, which highlighted a much publicized child abuse trial then taking place in California. Broderick and Polak discussed whether J.S.J. exhibited the signs of sexual molestation presented on the program. Polak suggested that Broderick talk to J.S.J. At her deposition, Broderick testified that she approached J.S.J. as follows:

"Hi, [J.S.J.], how are you doing?"

. . . .

"Can mommy talk to you for a little bit?"

. . . .

"I want to talk to you about ...," I think I said good touching and bad touching, "... and I'm just wondering if you're okay. If anybody has ever touched you in a way that doesn't make you feel good?"

And she looked at me and she shook her head and my jaw dropped 'cause she shook her head up and down. And I said, "Who?" I said, "Somebody's touched you down ..."

She says, you know, she shook her head yes.

And I [said], "Well, who did it?" And I had, [g]randma, grandpa, Gene, Dieter, anybody, everybody, I—everybody I knew.

And she says, "A mean lady" or "A lady."

. . . .

Yeah, she looked down and apparently felt she should stop talking. I told her it was—it was okay. She's helping and I'm

---

**1.** All inferences of fact have been drawn, as they must be, in favor of Broderick, the non-moving party. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985). We note that "[t]he court's function when ruling on a motion for summary judgment is to decide whether or not a genuine issue as to any material fact exists. [This] court ... [does] not resolve any existing genuine issues as to material facts

in determining a summary judgment motion." *Wilson v. Pollet,* 416 P.2d 381, 384 (Alaska 1966).

**2.** The program that J.S.J. attended is correctly called "tiny tots," whereas the "nursery" is for children two years of age and younger. However, Broderick frequently refers to the program J.S.J. attended as the "nursery."

not gonna' hurt her or get mad. And then she poured it all out. The mean lady at the church hurt her wee-wee.

On June 25 Broderick reported this information to the police, who then interviewed J.S.J.[3] J.S.J. did not specifically identify Gilman at the interview. On the same day, Broderick took J.S.J. to Humana Hospital where she was examined. The emergency room records and the examining physician's notes state that there were no external signs of sexual abuse.[4]

On July 1, 1984, the Sunday following the initial police interview, Polak and Broderick took J.S.J. to King's Way in an effort to ascertain who had abused J.S.J. When they began to walk downstairs to the "tiny tots" room, Polak observed that J.S.J. became frightened and began to cling to him. As they reached the classroom, J.S.J. yelled "No!" and began to cry and struggle. At the classroom, J.S.J. saw Gilman but refused to go to her. After leaving the classroom, Polak asked J.S.J. the identity of the woman in the "tiny tots" program. J.S.J. responded, "That's the mean lady. That's the lady that hurt me."

On October 21, 1985, Phillip Kaufman, M.S.,[5] J.S.J.'s counselor, prepared a letter for the police. Kaufman diagnosed J.S.J. as having post-traumatic stress as a result of being sexually abused. Kaufman concluded that "[g]iven the emotional make-up, behavioral indicators, and sporatic [sic] verbalization, it is felt that the child has, in fact, been molested."

### B

On October 23, 1987, Judith Broderick filed a complaint on behalf of J.S.J. alleging that Shirley Gilman sexually abused J.S.J. while the child was entrusted to the care of the King's Way "tiny tots" program. The complaint further alleged that King's Way was also liable under theories including negligent supervision and hiring and *respondeat superior.*

In July 1988, Gilman moved for summary judgment. In an affidavit Gilman averred that she never abused J.S.J. King's Way joined in Gilman's motion.

Broderick filed an opposition to Gilman's motion, supported in part by statements taken by the police from Broderick and Polak. In those statements Broderick and Polak recounted the July 1 visit to King's Way during which J.S.J. identified Gilman as her abuser. Gilman filed a reply to Broderick's opposition and moved to strike certain testimony and exhibits.

After retaining new counsel, Broderick filed additional materials in opposition to Gilman's motion for summary judgment. These materials included an affidavit by Lee Maxwell, Ph.D., who, after reviewing the Kaufman[6] report and interviewing J.S.J., determined that J.S.J. had been sexually molested. Also included was another affidavit by Broderick, in which she recounted her observations of the pinkish stains on J.S.J.'s panties on March 25, 1984, and of the blood in the toilet and on J.S.J.'s panties on April 8, 1984, following J.S.J.'s visits to the church with her father. Broderick also stated how J.S.J. identified Gilman at the subsequent church visit.

On December 13, 1988, the superior court granted Gilman's motion for summary judgment. In reaching its decision, the court ruled that the Maxwell affidavit was inadmissible. Although the court believed that it was not improper for an expert "to base [an] opinion[ ] upon the statements of others," it found that the Maxwell affidavit, and the Kaufman report on which Dr. Maxwell relied, presented "serious credibility problems." Broderick's deposition and affidavit testimony of J.S.J.'s declarations of abuse were ruled inadmissible as hear-

---

**3.** The police also interviewed Broderick and Polak. Jansen was not interviewed until August 1984. Ultimately the police investigation was terminated, and this case was filed.

**4.** The physician found no external trauma, but noted that the child was unusually frightened of the genital exam, which required a long time to complete. The records are unclear as to whether the genital exam included an internal exam.

**5.** Phillip Kaufman was J.S.J.'s counselor between August 1984 and February 1985.

**6.** Kaufman has left the jurisdiction and as yet has not been located.

say statements. The court further believed that even if Broderick were allowed to testify as to her observations, her credibility would be "subject to very serious attack."

Thereafter King's Way submitted a motion for summary judgment which was also granted. Broderick appeals the decision to grant summary judgment in favor of Gilman and King's Way.

## II

In reviewing the trial court's grant of summary judgment, we must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts. *Wassink v. Hawkins,* 763 P.2d 971, 973, 763 P.2d 971 (Alaska 1988); *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985). The moving party has the burden of proving an absence of issues of material fact. *Wassink,* 763 P.2d at 973. If the movant makes a prima facie showing that it is entitled to judgment on the established facts as a matter of law, the opposing party must demonstrate that a genuine issue of fact exists to be litigated by showing that it can produce admissible evidence reasonably tending to dispute the movant's evidence. *Id.* at 973; *Gregor v. City of Fairbanks,* 599 P.2d 743, 746 (Alaska 1979).

■ In deciding whether the non-moving party has met this burden, the court will "consider the affidavits, depositions, admissions, answers to interrogatories and similar material to determine ... whether any of the post-pleading material suggests the existence of any ... triable genuine issues of material fact." *Walker v. White,* 618 P.2d 561, 563 (Alaska 1980) (quoting *Jennings v. State,* 566 P.2d 1304, 1310 (Alaska 1977) (quoting 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2721 at 475–76 (1973))). If the parties choose to submit affidavits, they must be based upon personal knowledge, set forth facts that

would be admissible evidence at trial and affirmatively show that the affiant is competent to testify to the matters stated. Alaska R.Civ.P. 56(e). Specifically, opinion testimony and hearsay statements that would be inadmissible at trial are inadmissible in a motion for summary judgment. *See Williford v. L.J. Carr Investments, Inc.,* 783 P.2d 235, 238 n. 8 (Alaska 1989); *National Indemnity Co. v. Flesher,* 469 P.2d 360, 368 (Alaska 1970).

## III

### A

Our sole task in this appeal is to determine whether Broderick offered evidence sufficient to raise a triable issue as to: (1) whether J.S.J. was abused while at church, and (2) if so, whether she was abused by Gilman.[7]

### 1. *Evidence of Abuse*

Broderick has presented at least two pieces of admissible evidence which create a triable issue on the first of these two questions. First, there were her own observations of the blood spotting on J.S.J.'s panties following the church visits of March 25 and April 8, 1984. Second, Broderick submitted the affidavit of Dr. Maxwell.

Based upon his own interview and the indicia of post-traumatic stress articulated in the Kaufman report—*i.e.,* "hyperalert states, excessive clingyness and severe phobic reactions"—Dr. Maxwell concluded that J.S.J. had been sexually molested. Gilman opposed the affidavit, in part, because it did not include evidence which would qualify Dr. Maxwell as an expert witness. In response, Broderick submitted a supplemental affidavit by Dr. Maxwell which contained his qualifications as an expert in child sex abuse cases.

■ The superior court disallowed the Maxwell affidavits because it felt that "the ... affidavits when taken together create

---

7. We do not reach the other evidentiary issues as the following are sufficient to present a triable issue of material fact.

... a serious credibility problem." We disapprove of the trial court weighing the credibility of a witness when ruling on a motion for summary judgment. It may be true, as the trial court noted, that issues of credibility arise when a doctor signs an affidavit, possibly prepared by an attorney, and later signs another affidavit to meet objections to the first. Credibility is a factual issue, however, properly determined by the factfinder at trial, not a matter of law determined by the court in summary judgment. *See Grasle Electric v. Clark*, 525 P.2d 1081, 1083 (Alaska 1974); *Anthony v. State*, 521 P.2d 486, 492 (Alaska 1974).

Gilman argues that Maxwell's affidavit is deficient under Civil Rule 56(e) because the underlying data is unverified, and that assertions of fact in unverified pleadings and memoranda cannot be relied upon in denying a motion for summary judgment. This argument is flawed. Evidence Rule 703 allows an expert to base an opinion on hearsay evidence, which is by definition unverified testimony. *See* Alaska R.Evid. 703. The facts Dr. Maxwell relied upon and his opinion are set forth in a verified affidavit; therefore, the requirements of Civil Rule 56(e) have been met.

Next, Gilman argues that Dr. Maxwell's opinion incorporates a novel validation theory which has "not gained general acceptance in the field" of child sexual abuse. Gilman makes this argument in terms of Evidence Rule 703. However, the appropriate challenge of an expert's opinion as novel falls under Evidence Rule 702.[8] J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[03], at 702–34 (1990). If the opinion proffered by Dr. Maxwell "has been judicially recognized as a proper subject for expert testimony, the court need only consider whether the evidence will aid the jury in deciding the particular issues in the case." *Id.* We find that Dr. Maxwell's opinion meets the requirements of Evidence Rule 702.

In support of her validation argument, Gilman cites *Colgan v. State*, 711 P.2d 533 (Alaska App.1985). In *Colgan*, a family therapist was permitted to testify, in part, "I think all three girls have been abused, and I think they were accurate in their ability to be able to verbalize the differences in degree." *Id.* at 534. The testimony was allowed because Colgan did not properly preserve his objection for appeal and the testimony did not amount to plain error. *Id.* However, the court of appeals "entertain[ed] serious doubts as to the wisdom of routinely admitting expert testimony" which appears to validate the victim's veracity. *Id.*

Admittedly, "[t]estimony by an expert witness that purports to establish by scientific principles that another is telling the truth treads on dangerous legal ground." *Rodriquez v. State*, 741 P.2d 1200, 1204 (Alaska App.1987). Such was not the case here, however. Dr. Maxwell did not conclude that J.S.J. was telling the truth about her abuse. Rather, he stated his opinion that J.S.J. was abused and that her behavior, as indicated in the Kaufman report, was "clinically consistent with the finding that she [had been] sexually molested" and was suffering from "[p]ost-[t]raumatic [s]tress."

Expert testimony that a child has been sexually molested and is suffering from post-traumatic stress has routinely been admitted in court in other jurisdictions. *See State v. Robinson*, 153 Ariz. 191, 735 P.2d 801, 805 (1987) (psychologist testified that child was suffering from acute post-traumatic stress disorder as a result of sexual abuse); *State v. Hester*, 114 Idaho 688, 760 P.2d 27, 31–32 (1988) (expert can render opinion that child has been sexually abused); *Townsend v. State*, 103 Nev. 113, 734 P.2d 705, 707–08 (1987) (proper for expert to express opinion whether child had, in fact, been sexually abused; expert testimony regarding patterns of post-trau-

---

**8.** Evidence Rule 702(a) provides:
    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact

in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

matic stress disorder aids jury).[9] The *Townsend* court concluded that

> it is apparent that expert testimony concerning post-traumatic stress disorder patterns in sexually abused children satisfied the requirement of the evidence code in providing jury enlightenment on a critical and relevant subject of an esoteric nature. Similarly, it was proper for the State's expert to express an opinion on the issue of whether the child had, in fact, been sexually assaulted or abused. Such an opinion, although embracing an ultimate issue, represents both the peculiar expertise and consummate purpose of an expert's analysis.

*Townsend*, 734 P.2d at 708. We agree and find that Dr. Maxwell's testimony would satisfy the requirements of Rule 702.[10]

■ Finally, Gilman argues that Dr. Maxwell could not properly testify as to J.S.J.'s alleged sexual abuse, because he improperly based his opinion on the inadmissible Kaufman report.[11] *See* Alaska R.Evid. 703.[12] Even assuming that the Kaufman report is inadmissible, this argument also fails. Rule 703 explicitly allows an expert to rely on otherwise inadmissible evidence, so long as the material is of a type reasonably relied on by experts in the field. *Id.* We have previously held that

"[h]earsay can be a permissible basis for opinion testimony" provided the reasonable reliance test is satisfied. *Norris v. Gatts*, 738 P.2d 344, 349 (Alaska 1987). Moreover, experts may rely on information from other case workers in forming their opinions. *See In re J.R.B.*, 715 P.2d 1170, 1174 (Alaska 1986) (social workers and counselors could rely on information from other case workers as a basis for expert opinion).[13]

Evidence Rule 705 provides the parties a safeguard by allowing them to "request a determination of whether the requirements of Rule 703 are satisfied before an expert offers an opinion or discloses facts or data." Alaska R.Evid. 705(b).[14] Broderick correctly notes that Gilman did not make an Evidence Rule 705(b) request below.

### 2. *Identity of the Abuser*

■ The only evidence in the record establishing Shirley Gilman's identity as the abuser of J.S.J. comes from third-party accounts of J.S.J.'s identification of Gilman.[15] Such accounts fall squarely within Evidence Rule 801, which defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Alaska R.Evid. 801(c). Unless the hearsay comes

9. *See also State v. Myers*, 359 N.W.2d 604, 608–11 (Minn.1984) (expert may testify as to whether child has been sexually abused and whether child's behavior is consistent with that of other sexually abused children); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983) (same).

10. At trial, of course, Gilman will be free to cross-examine Dr. Maxwell about his opinion and the basis for it. She will also be able to present any contrary testimony from her own experts.

11. Broderick asserts that the Kaufman report is independently admissible under Evidence Rule 804(b)(5). We do not need to reach this issue as we hold Dr. Maxwell's affidavit sufficient to raise a triable issue of fact as to whether J.S.J. was abused.

12. Evidence Rule 703 provides:
    The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. Facts or data need not be admissible in evidence, but must

be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

13. There is some indication in the record that Judge Ripley did not consider Maxwell's reliance on Kaufman's report to be reasonable, apparently because Kaufman has left the jurisdiction and is not available for cross-examination. That reasoning, if correct, would allow an end run around the Rule 703 permission for experts to use inadmissible evidence. Kaufman's availability for cross-examination is fundamentally irrelevant in this regard; it is Maxwell's opinion which will be admitted, and Maxwell is available for cross-examination.

14. *See Norris*, 738 P.2d at 350–51 (factors in determining reasonableness of reliance).

15. Broderick and her boyfriend, Hans Dieter Polak, both state that J.S.J. identified Gilman as her abuser during a visit to the church. The girl also related to the psychologist, Dr. Lee Maxwell, that she had been abused by *the woman in charge of the church nursery—i.e.,* Gilman.

within the ambit of some exception provided by a statute or a rule prescribed by this court, it is inadmissible as evidence. Alaska R.Evid. 802.

■ Inadmissible hearsay assertions in an affidavit cannot be used either to oppose or support a motion for summary judgment. *Williford*, 783 P.2d at 238 n. 8. Thus, absent an applicable exception to Rule 802, the hearsay nature of the only evidence presently in the record that links Shirley Gilman to the abuse of J.S.J. would be fatal to Broderick's case. Under the facts of this case, however, Broderick's account of J.S.J.'s identification of Gilman falls under the residual exceptions to the hearsay rule found in Rule 803(23) and Rule 804(b)(5).[16]

■ Evidence Rule 803(23) provides:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, [is admissible] if the court determines that (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Alaska R.Evid. 803(23). We emphasize that this residual hearsay exception is intended to be used "sparingly" and only after rigorous application of the requirements of the section to the facts under consideration. Commentary, Alaska R.Evid. 803(23). We conclude, in light of all the facts in this particular case, that the hearsay accounts of J.S.J.'s identification of her abuser meet these requirements.[17]

Rule 803(23) entails five requirements for admissibility: (1) the statement which is the subject of the hearsay testimony must have circumstantial guarantees of trustworthiness equivalent to that possessed by the specific hearsay exceptions; (2) the statement must concern a material fact; (3) it must be more probative than any other evidence which the proponent can reasonably procure; (4) admission must best

---

**16.** The "language and purpose" of the two sections are "identical," Commentary, Alaska R.Evid. 804(b)(5), the only difference being whether the declarant is available (Rule 803) or unavailable (Rule 804). Because Broderick has said J.S.J. will testify at trial, we proceed under the assumption that the girl will be available and apply Rule 803(23). We recognize that, even if J.S.J. takes the stand, her inability to remember the identification may result in her being technically "unavailable." Alaska R.Evid. 804(a) ("Unavailability of a witness includes situations in which the declarant ... (3) establishes a lack of memory of the subject matter of the statement."). That distinction may sometimes have a bearing on the outcome of residual exception analysis; it does not seem to be dispositive in this case.

Although the parties briefed the issue through reference to Rule 804(b)(5), the identical nature of the two sections means that they are both fairly before the court.

**17.** The admission of child hearsay in child abuse cases by courts in other jurisdictions using residual exception clauses identical to our own is widespread. *See, e.g., United States v. St. John*, 851 F.2d 1096, 1098 (8th Cir.1988) (noting "formidable line of Circuit precedent that sanctions the use of hearsay testimony in child sexual abuse cases"); *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801, 810–12 (1987); *Oldsen v. People*, 732 P.2d 1132, 1136–37 (Colo.1986); *State v. Dollinger*, 20 Conn.App. 530, 568 A.2d 1058, 1062–64 (1990); *State v. Hester*, 114 Idaho 688, 760 P.2d 27, 35–39 (1988); *State v. Larson*, 453 N.W.2d 42, 46–47 (Minn.1990); *State v. Doe*, 94 N.M. 637, 614 P.2d 1086, 1088 (1980); *State v. Sorensen*, 143 Wis.2d 226, 421 N.W.2d 77, 83–87 (1988).

We stress, however, that our acknowledgement here that the residual exception may sometimes be appropriate in the child abuse context does not create a new class exception to the hearsay rule. *See* J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(24)[01], at 803–382 through 803–383 (1990). Rather, the trial judge should conduct a searching review of the facts of the individual case before determining the applicability of either Rule 803(23) or Rule 804(b)(5).

serve the general purposes of the evidence rules and the interest of justice; and (5) the opponent must have appropriate notice that the hearsay will be offered.

Turning to the first requirement, we must assess whether the circumstances surrounding the identification of Gilman suggest trustworthiness to the same degree as the circumstances giving rise to the established hearsay exceptions. Because the twenty-two situations specified as exceptions under Rule 803 vary greatly in their circumstantial indicia of trustworthiness, this standard is necessarily inexact. In this situation, several factors support the conclusion that J.S.J.'s statements of identification are trustworthy enough to justify their admission in hearsay form.[18]

First, the record indicates that the identifications were spontaneous, made without undue suggestions by someone else. *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801, 811 (1987); *see also State v. Ryan*, 103 Wash.2d 165, 691 P.2d 197, 205 (1984) (spontaneity one factor in determining reliability of out of court statement). At the time that J.S.J. first told her mother of the abuse, Broderick asked her who did it. Although Broderick did suggest a number of individuals—such as J.S.J.'s father, her grandparents and Broderick's boyfriend—the girl named a perpetrator that Broderick did not suggest: "[t]he mean lady at the church." When Broderick and Polak took J.S.J. to the church, the girl reacted to Gilman's presence immediately upon seeing the woman. She then told them that Gilman was "the mean lady—that's the lady who hurt my wee-wee."

J.S.J.'s age at the time of the identifications is also a factor suggesting trustworthiness. The girl was three and a half years old when she identified Gilman as her abuser. As the Eighth Circuit noted under similar circumstances, "a declarant's young age is a factor that may substantially lessen the degree of skepticism with which we view their motives." *United States v. Renville*, 779 F.2d 430, 441 (8th Cir.1985) (involving eleven-year-old sexual abuse victim); *see also United States v. Cree*, 778 F.2d 474, 477 (8th Cir.1985) (four year old victim's age "a significant factor supporting the finding that the challenged statements are trustworthy"). Expert material in the record reinforces this factor. Phillip Kaufman notes that "[c]hildren, up until age 6[,] are unable to practice real deception.... Because of [J.S.J.]'s age, she has few internalized limits and lacks the ability or sophistication to be deceptive, devious or calculating, even over a short period of time."[19] By the same token, no evidence exists in the record to suggest that J.S.J. would have a motive to lie in identifying Gilman as her abuser, even assuming that she had the capability to do so.

J.S.J.'s use of "childish terminology" also gives her identification of Gilman "the ring of verity." *United States v. Nick*, 604 F.2d 1199, 1204 (9th Cir.1979); *see also Robinson*, 735 P.2d at 811 (five-year-old's "childlike description of [sexual abuse] give her statements the ring and quality of truth"). J.S.J. told Broderick and Polak that Gilman was the "mean lady"—the "bad lady"—who had hurt her "wee wee" and her "bum bum." She also indicated to

---

**18.** As the United States Supreme Court recently noted in analyzing child hearsay in the closely related context of a confrontation clause challenge,

> [t]hese factors are, of course, not exclusive, and courts have considerable leeway in their consideration of appropriate factors. We therefore decline to endorse a mechanical test for determining "particularized guarantees of trustworthiness" under the Clause. Rather, the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.

*Idaho v. Wright*, — U.S. ——, ——, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 656 (1990). The

factors used by the Court there included spontaneity, consistency and lack of motive to fabricate. *Id.*

**19.** Although the Kaufman material may not be admissible at trial, it is properly before us in considering the circumstances surrounding these hearsay statements. *See* Alaska R.Evid. 104(a) (in preliminary determination of admissibility, court not bound by rules of evidence other than those of privilege); *United States v. Matlock*, 415 U.S. 164, 173–74, 94 S.Ct. 988, 994, 39 L.Ed.2d 242 (1974) (court could properly consider hearsay evidence in making preliminary determination whether seizure of material violated Fourth Amendment).

Broderick that the mean lady had touched her "heart," meaning her breast.

■ J.S.J.'s consistency in linking the "mean lady" at the church to the abuse is another factor suggesting trustworthiness. *Cree,* 778 F.2d at 477 & n. 5. Although consistency may sometimes suggest rehearsal, the facts in this case militate in favor of reliability. J.S.J. referred to the "mean lady" at the church the first time she discussed the fact that she had been abused.[20] Subsequent to that initial revelation, J.S.J. identified the "mean lady" at the church as her abuser in statements to her mother, to her mother's boyfriend, and to a child psychologist.

■ The fact that the witnesses to J.S.J.'s statements—Broderick and Polak—may be unreliable or motivated by selfish interests is irrelevant to evaluation of the reliability of the statements themselves, which is what concerns us here. Noting that the circumstantial guarantees of trustworthiness under the residual exception must be "equivalent" to the guarantees underpinning the specific exceptions, the Seventh Circuit has concluded: "The specific exceptions to the hearsay rule are not justified by any circumstantial guarantee that the witness who reports the statement will do so accurately and truthfully. That witness can be cross-examined and his credibility thus tested in the same way as that of any other witness." *Huff v. White Motor Corp.,* 609 F.2d 286, 293 (7th Cir. 1979). We agree and reiterate that credibility of witnesses is "exclusively within the province" of the trier of fact. *Grasle Electric,* 525 P.2d at 1083.

The remainder of the requirements of Rule 803(23) are easily satisfied. J.S.J.'s statements are offered to prove a material fact and there is nothing more probative in a child abuse case than the victim's personal statements regarding the incident. *See Robinson,* 735 P.2d at 812. Admission in this case serves the interest of justice by giving a jury the opportunity to resolve issues of fact surrounding these grave charges. Notice clearly is not a problem. We conclude, in light of the above, that J.S.J.'s statements are admissible for purposes of proving the identity of her abuser.

**B**

We turn finally to King's Way's argument that, even if there are material issues sufficient to prevent entry of summary judgment in favor of Gilman, the superior court's grant of summary judgment in favor of the church should be affirmed.[21]

In support of such argument, King's Way points to that part of Broderick's complaint alleging that King's Way was negligent because it failed to investigate Gilman's background before hiring her.[22] Broderick's theory is that, if King's Way had done a proper background investigation, it would have learned that Gilman had been sexually abused as a child. This, according to Broderick, should have alerted King's Way to the danger that Gilman might sexually abuse children placed in her care.

King's Way argues that it was entitled to summary judgment, *whether or not Broderick's legal theory of liability was cor-*

---

20. The fact that this discussion and identification came quite some time after the actual abuse does not render such evidence inadmissible. Timeliness is a function of circumstance. *See Greenway v. State,* 626 P.2d 1060, 1061 (Alaska 1980). When a three year old girl complains of sexual abuse almost immediately upon being asked for the first time about improper touching, such a complaint has indicia of trustworthiness.

21. From the record we cannot tell on what particular basis the trial court granted King's Way's motion for summary judgment.

22. Broderick also initially sought relief against King's Way under a theory of *respondeat superi-*

*or,* but has not argued that theory before this court. We thus leave for another day the important question of whether a childcare provider can be vicariously liable for the intentional sexual torts of one of its agents. *Compare Doe v. Samaritan Counseling Center,* 791 P.2d 344, 348 (Alaska 1990) (clinic could be held liable in *respondeat superior* for therapist's negligent mishandling of transference phenomenon, which resulted in unethical sexual relations between therapist and plaintiff-patient) *with id.* at 350 (Moore, J., dissenting) (sexual misconduct was intentional and vicarious liability therefore inappropriate).

*rect*, because Broderick submitted no competent evidence to support her contention that the church knew or should have known of Gilman's alleged propensity to sexually molest children; the only "evidence" that she presented was her own affidavit stating her belief that such was the case, based on Gilman's deposition testimony that she had been sexually abused as a child.[23] Broderick's opinion, according to King's Way, was mere conjecture and lacked a proper foundation.[24]

Whether King's Way knew or should have known of the danger that Gilman might sexually molest children left in her care is a question of fact. Thus, in reviewing the superior court's grant of summary judgment, we, like that court, must draw all inferences in favor of the non-moving party. *Zeman*, 699 P.2d at 1280. Certainly at trial the burden will be on Broderick, as plaintiff, to prove all the elements of her case. On King's Way's motion for summary judgment, however, *King's Way bears the burden of showing that the evidence as currently adduced leads to only one reasonable conclusion:* it could not have reasonably known about any propensity of Shirley Gilman to abuse children. *See Zeman*, 699 P.2d at 1281.[25]

■■■■ Before the alleged impropriety with J.S.J., there is no evidence that Gilman engaged in any inappropriate sexual activities. On the other hand, "[t]he master, in selecting an employee, must exercise a degree of care commensurate with the nature and danger of the business in which he is engaged and the nature and grade of service for which the servant is intended." 57 C.J.S. *Master & Servant* § 559, at 271 (1948). In the present case, King's Way was in the business of providing a safe place for the care of young children whose parents were attending church services. It engaged Gilman to make sure that those children were properly cared for. We consider it self-evident that the selection of individuals to whom the care and safety of young children will be entrusted requires a relatively high level of care before it may be considered reasonable.

■■■■ King's Way did not interview Gilman or conduct a background check, nor has it offered any evidence that Gilman's past sexual abuse did not affect her competency.[26] The evidence before the court is thus insufficient to require a finding as a matter of law that King's Way exercised due care in screening Gilman or that there are no issues of material fact for determination by the jury.

The orders granting summary judgment to Gilman and King's Way are VACATED and the case is REMANDED for proceedings consistent with this opinion.

---

**23.** In her deposition, Gilman revealed that she had been sexually abused as a child, both by her natural father and, subsequently, by her stepfather. As an adult, she was physically abused by her first husband.

**24.** King's Way, in its brief, argued that Broderick's "expertise" was not supported by any evidence, and that her opinion, in any event, was of a kind which would probably not be admissible at trial, citing *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *Pulakis v. State*, 476 P.2d 474 (Alaska 1970); *Colgan*, 711 P.2d at 534; *State v. Fitzgerald*, 39 Wash.App. 652, 694 P.2d 1117 (1985).

**25.** King's Way's argument that Gilman's position as a volunteer did not require a formal interview or background check is without merit. A volunteer may be a servant if subject to the control of another. *See* Restatement (Second) of Agency §§ 220, 225 (1958). Therefore, a volunteer may be subject to the same interview and background checks as any other servant.

**26.** It has been noted:

[O]ne of the predisposing conditions [to child sexual abuse] that has been of considerable interest to clinicians and researchers is an experience of sexual abuse in childhood. Being sexually victimized as a child is a common experience for adult sex offenders and mothers of victims of sexual mistreatment. Moreover, childhood experiences of sexual abuse have been found at higher rates among those who victimize or are mothers of victims than in comparison groups.

Faller, *Why Sexual Abuse? An Exploration of the Intergenerational Hypothesis*, 13 Child Abuse and Neglect 543, 543 (1989) (citations omitted).