NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity of the Hospitalization of | ) ) Supreme Court No. S-18827 ) |
| LAWRENCE G. | ) Superior Court No. 3AN-23-01480 PR ) ) MEMORANDUM OPINION ) AND JUDGMENT* ) ) No. 2084 – April 9, 2025 ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Judge.

Appearances: Lindsey Bray, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for Lawrence G. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

A man was hospitalized for evaluation after reports that he repeatedly threatened to kill his mother. Following a petition by hospital staff, the superior court ordered his involuntary commitment for 30 days, finding clear and convincing evidence

---

\*        Entered under Alaska Appellate Rule 214.

that he was mentally ill and that he posed a danger to himself and others. The court determined that his treatment needs could not be met on an outpatient basis.

The man appeals the superior court's commitment order. He challenges the finding that there were no less restrictive alternatives to commitment. But we see no error in the superior court's analysis or findings, so we affirm the commitment order.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Lawrence G. has suffered from mental illness for a number of years.[1] In June 2023 Lawrence's mother called the police, reporting that he had threatened to harm her. After Lawrence made similar threats to kill his mother in an appointment with his primary care provider, the provider sent him to the emergency room. Emergency room staff petitioned for an order authorizing Lawrence's hospitalization for evaluation.

### B.    Proceedings

#### 1.    Initial hospitalization

The superior court issued an order authorizing Lawrence's hospitalization for evaluation. The court found there was probable cause to believe Lawrence was mentally ill, likely to cause harm to others, and gravely disabled. Lawrence was transported to Alaska Psychiatric Institute (API).

#### 2.    Petition for 30-day involuntary commitment

At API, psychiatric nurse practitioner Josh Bearden evaluated Lawrence. After the evaluation Bearden petitioned for Lawrence's 30-day involuntary commitment. The petition alleged that Lawrence was gravely disabled because his thought distortions would prevent him from being able to adequately meet his needs if discharged. The petition alleged that Lawrence was likely to cause serious harm to others due to having "[e]xpressed wanting to kill his mother prior."

---

[1]    We use a pseudonym to protect confidentiality.

### 3. Commitment hearing

A superior court master held a hearing on Lawrence's commitment the same day the petition was filed. Bearden was the State's only witness. Lawrence testified on his own behalf.

Bearden testified that Lawrence's psychiatric conditions, particularly schizoaffective disorder, were causing Lawrence to experience hallucinations and delusions. Bearden testified that Lawrence's "primary delusion," which he had expressed during his time at API, was that his mother was not in fact his mother, but rather his "power of attorney" who was impersonating his mother.

Bearden testified that he believed Lawrence was likely to harm others. He testified that Lawrence's mother had told him Lawrence had put guns to her head and knives to her throat numerous times. Bearden testified that he was mostly concerned that Lawrence would harm his mother, but that he was also concerned for Lawrence's own safety and the safety of others "due to [his] low frustration tolerance." Lawrence had expressed a desire to be discharged to a local shelter and to then move to Oregon to live with his father. But Bearden testified that this plan could put Lawrence or others at risk due to Lawrence's difficulty communicating his needs and his frustration with others for not understanding him.

Regarding his opinion that Lawrence was gravely disabled, Bearden testified that he thought Lawrence would struggle to meet his basic needs if discharged. He testified that he doubted Lawrence could successfully communicate with shelter staff to figure out where to get food and other essentials, even though he had been able to make his needs known at API and had maintained adequate hygiene. Bearden testified that Lawrence had been taking his medication at API. But Bearden testified that he did not think Lawrence would continue taking it if discharged and that, without medication, his condition would "continue to deteriorate." Ultimately, Bearden concluded that Lawrence would be best served by continued medication, supervision, and treatment at API.

Lawrence testified on his own behalf. Regarding Bearden's testimony about threats to his mother, Lawrence claimed, "This lady is not my mother." He also testified that he had "a lot of kids," had served in the military, and "just got [his] . . . toes cut off for no reason." According to Bearden, these assertions were delusions.

Lawrence denied having a mental illness. He testified that he did not know why he needed medication but would take it at his discretion.

Lawrence expressed a desire to be discharged to live with his father in Oregon. He insisted that he did not want to return to his mother's home and would attempt to coordinate with his sister and the police to make a plan for retrieving his belongings from his mother's home.

Lawrence expressed his belief that people, including his outpatient provider and his mother, were following him or otherwise trying to harm him. When his attorney asked him about his plan to live in Oregon, Lawrence appeared convinced that she was trying to follow him and stated that he would defend himself if she did so. In response to questioning on cross-examination, Lawrence appeared to challenge the State's attorney to a physical confrontation.

### 4. Commitment order

The master made oral findings on the record and granted the commitment petition. She found by clear and convincing evidence that Lawrence was suffering from mental illness. She found that Lawrence was likely to harm others due to his paranoid delusions about his mother, his statements to API staff that he wanted to "punch his outpatient provider in the face," and his statements during the hearing about defending himself.

The master also found that Lawrence was gravely disabled. She determined that Lawrence would be in danger if discharged because he could not engage in "give-and-take with people in the community around him."

Regarding alternatives to commitment, the master found that discharge from API was not safe for Lawrence, his mother, or the community. She found that

Lawrence was unlikely to take his medication on an outpatient basis because he "ha[d] zero insight into his current psychiatric condition." She also found that Lawrence could not be safely discharged at that time to his father, who was not in Alaska. But even if Lawrence's father had been in Alaska, the master expressed "significant concerns" about discharging Lawrence in his current state, "given his demonstrated paranoia and the delusional behavior and thought content."

Lawrence objected to the master's order for a 30-day commitment. He argued that the evidence that he posed a risk of harm to others was not sufficiently recent and that his behavior at API showed that he was not gravely disabled.

The superior court ordered Lawrence's involuntary commitment for 30 days. The court did not address Lawrence's objection to the master's grave disability finding. But the court found there was clear and convincing evidence that Lawrence posed a danger to others, based on his conduct towards his mother as well as his statements during the proceedings.

The court also found that there were no less restrictive alternatives to commitment that were feasible and available. The court determined that Lawrence could not be discharged to his father because his "mental illness need[ed] to be stabilized." Nor could Lawrence be discharged to live with his mother or sister. Finally, the court found that discharge to the shelter system was not feasible for two reasons: first, because Lawrence "ha[d] never been homeless and [was] not mentally stable enough to know how to apply for and use the resources available to him on the streets"; second, because Lawrence stated he would not take medication.

Lawrence appeals, challenging the superior court's finding that the 30-day commitment was the least restrictive alternative for treating his condition.

## III. DISCUSSION

A person may be committed for involuntary treatment only if the court finds by clear and convincing evidence that the person is "mentally ill and as a result is

likely to cause harm to [himself] or others or is gravely disabled" and that "no less restrictive alternative exists that would provide adequate treatment and protection from harm."[2]

When we review the superior court's decision to involuntarily commit a person, we review factual findings for clear error.[3] Clear error exists "only if we have a 'definite and firm conviction that a mistake has been made.' "[4] "Whether those findings meet the involuntary commitment and medication statutory requirements is a question of law we review de novo."[5]

## A. We Review Lawrence's Claims For Plain Error.

Lawrence's objections to the master's ruling did not challenge the finding that commitment was the least restrictive alternative for meeting his treatment needs. He argued that the evidence that he posed a risk of harm to others was not sufficiently recent and that his behavior at API showed that he was not gravely disabled. On appeal, however, Lawrence challenges aspects of the superior court's least restrictive alternative finding. He argues that the evidence showed he was a danger to his mother only, not to other people, and that the court should have considered this fact when considering the availability of less restrictive alternatives. He also challenges the role of medication in the court's analysis of less restrictive alternatives. Because he did not raise these arguments in his objections to the master's findings, we review them for

---

    **2**    AS 47.30.735(c).

    **3**    *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

    **4**    *Id.*

    **5**    *Id.*

plain error.**6** "A plain error involves an 'obvious mistake' that is 'obviously prejudicial.' "**7**

### B. The Superior Court Did Not Plainly Err In Relying On The Risk Lawrence Posed To Members Of The Public When Considering Less Restrictive Alternatives To Hospitalization.

The superior court found that Lawrence was likely to cause serious harm to others based on his delusions, his violent behavior involving his mother, and his difficulty engaging in "give-and-take with people in the community around him." Lawrence argues that the evidence before the superior court demonstrated that he was a threat to his mother only, not to the general public. Thus, he argues that in determining whether hospitalization was the least restrictive means for meeting his treatment needs, the superior court should have focused solely on whether other alternatives could adequately mitigate the risk Lawrence posed to his mother. We disagree.

Evidence in the record supports the superior court's finding that Lawrence was likely to cause serious harm to members of the public. A person is "likely to cause serious harm" if the person is "likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person" or if the person "manifests a current intent to carry out plans of serious harm to that person's self or another."**8**

According to Bearden's testimony, Lawrence had threatened to kill his mother several times, holding guns to her head and knives to her throat. His most recent threat occurred less than a week before he was hospitalized. He also exhibited threatening behavior toward others, including during the commitment hearing. When

---

**6** *In re Hospitalization of Carter K.*, 557 P.3d 755, 761-762 (Alaska 2024).

**7** *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (first quoting *State, Dep't of Revenue, Child Support Enf't Div. ex rel. P.M. v. Mitchell*, 930 P.2d 1284, 1288 (Alaska 1997); and then quoting *Adams v. State*, 261 P.3d 758, 770 (Alaska 2011)).

**8** Former AS 47.30.915(15) (2022).

his attorney asked about his plan to live in Oregon, Lawrence stated, "I'm going to let you know I am going to defend myself. Once you follow me and I see you, . . . you're not going to like it." Later, on cross-examination, he appeared to challenge the State's attorney to a confrontation outside of court: "[W]hen this court . . . is over, you can just deal with me. And you acting like you afraid. If you are — if you — I'm not making no judgment, but are you afraid?" The master found that these threats indicated he was likely to cause serious harm to others.

Consistent with Lawrence's behavior at the hearing, Bearden testified that he had concerns about Lawrence's safety and the safety of others due to his "low frustration tolerance." He testified that if Lawrence attempted to communicate his needs to someone who could not understand him while living on the streets, it could result in Lawrence "hurting someone or being hurt by another individual." Bearden also testified that when API staff asked Lawrence whether he would seek treatment from his outpatient medical provider, he told them he would punch the provider in the face.

We defer to the master's credibility findings as to whether Lawrence's statements were threatening.[9] And although some of the evidence of Lawrence's behavior may have been hearsay, it was not objected to at the commitment hearing.[10]

---

[9] *See Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009) ("We will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony." (citing *Vezey v. Green*, 171 P.3d 1125, 1128-29 (Alaska 2007))).

[10] *See Hayes v. State*, 581 P.2d 221, 222 & n.2 (Alaska 1978) (rejecting argument that admission of hearsay evidence without objection constitutes plain error).

Even if it had been hearsay, Bearden, as an expert health care provider, was permitted to rely on those out-of-court statements to form his opinion.[11]

It was not obviously wrong to find that Lawrence posed a risk of serious harm to people besides his mother therefore, the superior court did not plainly err by ruling that commitment was the least restrictive alternative to prevent the dangers Lawrence posed.

**C.    The Superior Court Did Not Err In Rejecting Less Restrictive Alternatives Based On Lawrence's Need For Medication And His Unwillingness To Take It In An Outpatient Setting.**

The superior court found that discharging Lawrence into the shelter system so he could pursue outpatient treatment was not a feasible alternative to hospitalization. Lawrence challenges the superior court's ruling on three grounds. Lawrence did not raise these arguments in his objections to the master's findings. We review two of these arguments for plain error. Because the third argument pertains to a finding first made by the superior court, to which Lawrence did not have an opportunity to object, we do not apply plain error to it.

First, Lawrence argues that the court erred in its least restrictive means analysis because it did not probe Lawrence's need for medication despite conflicting evidence about whether medication was an effective treatment for his condition. Lawrence relies on *In re Hospitalization of Sergio F.* and *In re Hospitalization of Declan P.*, in which we emphasized the need for the State to present evidence that it

---

[11]    Alaska R. Evid. 703 (providing that facts or data on which expert bases opinion "need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject"); *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1216 (Alaska 1991) ("Evidence Rule 703 allows an expert to base an opinion on hearsay evidence, which is by definition unverified testimony."); *In re Hospitalization of R.M.*, Nos. S-18144/S-18193, 2023 WL 3494859, at *6 (Alaska May 17, 2023) (noting that experts routinely interpret eyewitness accounts of others "through the lens of specialized knowledge").

actually considered less restrictive alternatives and why these alternatives were not available or adequate to treat a respondent's condition or keep others safe.[12]

In this case, the State and the superior court did what *Sergio F.* and *Declan P.* require. The State presented two possible alternatives: to release Lawrence to his father in Oregon and to release him to a shelter in Anchorage. The superior court considered discharging Lawrence to live with his father, but found that his father was not yet available to receive him. The court also considered discharging Lawrence to the shelter, but found that this option was not feasible because Lawrence would be unlikely to take his medication and was not sufficiently stable to navigate shelter services unmedicated.

Lawrence goes beyond the holdings in *Sergio F.* and *Declan P.* to argue that when evidence of a particular treatment's efficacy is conflicting, the court commits legal error by not sua sponte probing further to determine whether the treatment is necessary. He argues that in this case, when both options presented by the State entailed him taking his medication, it was error for the court to not also expressly consider an alternative that did not involve medication because the evidence that he needed medication was open to different interpretations.

But the superior court can make a factual finding based on conflicting evidence without being required to sua sponte elicit additional evidence.[13] Neither

---

[12] *See In re Hospitalization of Sergio F.*, 529 P.3d 74, 80-82 (Alaska 2023) (holding State failed to meet burden of proving no less restrictive alternatives to hospitalization were available because State failed to explore any options beyond respondent's proposed plan); *In re Hospitalization of Declan P.*, 538 P.3d 318, 323-27 (Alaska 2023) (holding same).

[13] *See Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) ("[I]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence." (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001))); *In re Hospitalization of*

*Sergio F.* nor *Declan P.* requires the court or the State to consider a third alternative whenever there is conflicting evidence on the feasibility of the two alternatives that the State has considered and rejected.

Second, Lawrence disputes the court's finding that he would not take his medication on an outpatient basis, as well as the court's implicit finding that medication was needed to manage Lawrence's delusions and protect others.[14] But these findings are not plainly erroneous since they are supported by the record.

The finding that Lawrence would not take his medication is supported by Bearden's testimony that he did not believe Lawrence would take his medication in an outpatient setting. The finding is also supported by Lawrence's testimony that he "never needed medication" and doesn't "do medication" as well as his conflicting testimony about whether he would take medication of his own volition. It is the superior court's role to "judge witnesses' credibility and to weigh conflicting evidence,"[15] so we defer to the court's apparent finding that this testimony was credible.

The court's implicit finding that Lawrence needed medication to manage his conditions is not plainly erroneous either. Bearden testified that, based on discussions with Lawrence's family members, it appeared Lawrence had been deteriorating for several years while receiving outpatient treatment. Bearden testified that medication was necessary to prevent Lawrence's symptoms from worsening, though he also testified that Lawrence's condition had not improved during his time at

---

*Danielle B.*, 453 P.3d 200, 202-03 (Alaska 2019) ("We grant 'especially great deference' when the 'findings require weighing the credibility of witnesses and conflicting oral testimony.' " (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011))).

[14] In finding that discharge to the shelter was not a viable option, the superior court implicitly accepted Bearden's expert opinion that Lawrence needed medication to reduce his delusions and his risk of harming others.

[15] *Tessa M.*, 182 P.3d at 1114 (quoting *In re Adoption of A.F.M.*, 15 P.3d at 262).

API, while he was taking medication. Lawrence suggests that this testimony shows that medication was unnecessary to stabilize Lawrence because it had not yet alleviated his symptoms. But it was not an obvious mistake for the court to conclude that Lawrence needed medication. In light of Bearden's testimony and Lawrence's testimony denying his mental illness, the court could have reasonably inferred that Lawrence had not been taking his medication consistently and that a more consistent medication regimen would alleviate his symptoms. In sum, it was not plain error for the superior court to weigh the conflicting evidence and find that Lawrence needed medication to stabilize.

Third, Lawrence argues that the superior court improperly relied on his lack of experience with being homeless to determine that discharge to a shelter was not a feasible alternative.[16] If the court had relied solely on Lawrence's lack of familiarity with being homeless as a basis for rejecting the shelter as a less restrictive alternative, that would be error.[17] But we do not read the court's finding that way. Rather, we read the court's finding to mean that in light of Lawrence's mental instability, unwillingness to continue taking medication, and lack of experience living on the streets, he would not be able to safely navigate the shelter system. This finding is neither legally improper nor clearly erroneous in light of the testimony presented.

---

[16]    Because this was a finding made in the first instance by the superior court, not the master (whose analysis of least restrictive alternatives focused on his need for medication, his father's inability to immediately care for him, and his delusional behavior), Lawrence had no opportunity to raise it in his objections below. Therefore, we do not apply plain error review to this finding. *See, e.g.*, *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1286 n.93 (Alaska 2020) (declining to review issue for plain error when party lacked opportunity to object to issue).

[17]    *See, e.g.*, *In re Hospitalization of Mark V.*, 375 P.3d 51, 58-59 (Alaska 2016) (holding that "deliberate consideration" of less restrictive alternatives to commitment is "critical to the protection of the respondent's liberty interests"), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)).

For these reasons, we see no error or plain error in the superior court's analysis of least restrictive alternatives to commitment.

## IV.  CONCLUSION

We AFFIRM the superior court's order committing Lawrence to API for 30 days.