Jeffrey KINZEL and Cheryl
Kinzel, Appellants,

v.

DISCOVERY DRILLING, INC., and
Hart Crowser, Inc., Appellees.

No. S–10190.

Supreme Court of Alaska.

June 25, 2004.

Marion C. Kelly, Bernard P. Kelly, Wade, Kelly & Sullivan, Anchorage, for Appellants.

Paul S. Wilcox, Lisa C. Hamby, Hughes Thorsness Powell Huddleston & Bauman LLC, Anchorage, for Appellee Discovery Drilling, Inc.

Mary L. Pate, Eide, Miller & Pate, P.C., Anchorage, for Appellee Hart Crowser, Inc.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

**INTRODUCTION**

Jeffrey Kinzel filed an occupational safety and hazard complaint against Hart Crowser,

the company with which his employer, Discovery Drilling, had subcontracted. He was subsequently reassigned to a different worksite, where he injured his back. He filed for worker's compensation and took medical leave, but was soon fired. He sued Hart Crowser for defamation, negligence, and intentional interference with contract, and his employer for defamation and wrongful termination. After some claims were dismissed on summary judgment, a jury rendered a verdict for both defendants on all remaining claims. This appeal involves a number of challenges to the superior court's pre-trial and trial rulings.

## FACTS

In the summer of 1998, Kinzel was a laborer on an environmental cleanup site at Fort Wainwright. As a general laborer Kinzel was open to any kind of work, but the majority of his time was spent digging trenches in a small, closed-cab backhoe. This was considered less demanding work than some of the other job possibilities at the site.

Kinzel's employer, Discovery Drilling, Inc., provided subcontracting work for Hart Crowser, Inc., an environmental engineering company. The two companies had a long relationship. For the Fort Wainwright site, Hart Crowser subcontracted with Discovery for both drilling and remediation services. Specifically, Discovery's role in the project was in part "soil and ground water remediation," a process of digging trenches with a backhoe and then assembling a grid of wells, pumps, and pipes known as a "remediation system" intended to remove environmental contaminants from groundwater and soil. This was a two-man job for Discovery, employing only Kinzel and his colleague Gary Erickson. Though Erickson had more seniority, Kinzel served in a de facto supervisory capacity for the pair, as he was more familiar with the Fort Wainwright location and the Hart Crowser employees who worked there from his previous summer at the site. In particular, Kinzel had more open lines of communication with Craig Martin, Hart Crowser project manager and the ranking supervisor at the site. Kinzel's supervision applied only to Erickson, and he was

subject to the supervision and control of both his employer and Hart Crowser.

Beginning in May of that year and continuing until the Fourth of July weekend, the weather was hot and windy. As a result, Kinzel and Erickson had problems with dust. In early June, because of a severe sinus infection, Erickson was forced to visit a doctor. He immediately suspected that his sickness was connected to the worksite dust, and filed an anonymous complaint with the Alaska Department of Labor, Division of Occupational Safety and Health (OSH). It appears that this complaint was never investigated.

Kinzel also sought medical attention for a respiratory infection. This resulted in his having to take several days leave. Kinzel testified that after his sickness he was more vocal about potential safety issues involving dust, but eventually found it "pointless to keep on complaining" because Hart Crowser's project manager, Martin, "didn't want to hear about it."

The dust became a bone of contention because Martin thought the Discovery employees were wasting too much time and were going over his head to solve a problem that he felt was minor or nonexistent. Martin found Kinzel's efforts especially problematic because Hart Crowser and Discovery employees often worked on joint projects, and he believed Hart Crowser could get little or nothing done if Discovery employees were spending time trying to avoid or control dust. Martin told Kinzel and Erickson to "quit ... whining" and "if [they] have a problem with the dust [they] can just leave."

During the Fourth of July weekend, Discovery's president Kyle Brown and Kinzel met to discuss the growing difficulties between Discovery and Hart Crowser employees at the Fort Wainwright site. Brown seemed to be particularly concerned with the tension between Kinzel and Martin. He and Kinzel spoke of communication problems and apparently came to a mutual agreement about getting a fresh start at the site.

After the weekend, dust became less of a problem as the work changed to a new area. However this new worksite emitted a pungent, gasoline or pesticide odor which many

feared was unsafe. Hart Crowser tested the ground water but found no significant contamination. Around the same time, fearing that nothing was being done in response to Erickson's complaint, Kinzel filed an OSH complaint, eventually prompting an investigation.

Around the time of the OSH inspector's arrival at the site, Hart Crowser cordoned off an "exclusion zone" encircling a suspected area of contamination. No one was permitted into this zone without a respirator. Kinzel expressed some resistance to wearing a mask just to enter the zone, because this would require him to shave off his beard.

On July 25 a Hart Crowser employee, Bryan Johnson, reported to Martin that he had seen Kinzel in the exclusion zone without a respirator for the second time. At Hart Crowser's request Kinzel was asked to leave the Fort Wainwright worksite, and he reported back to Discovery's Anchorage headquarters.

After Kinzel returned to Anchorage, Discovery reassigned him to a more arduous job in Glennallen, under the supervision of a foreman whom Kinzel believed to be hard on his men. After several days of long shifts and heavy lifting, Kinzel suffered serious back pain. He asked to be relieved from the project, and on August 2 returned to Anchorage, visiting a doctor the following day. His doctor, Dr. Derek Hagen, gave him a note releasing him to light duty work only.

Kinzel returned to the Discovery office and had a conversation with Brown, the substance of which was disputed at trial. Discovery claims that Brown had light duty work available for Kinzel, but that Kinzel told Brown he was supposed to take two to three days off, never revealing the "light duty" doctor's note. Kinzel claims that he attempted to give the note to Brown, but that Brown refused to look at it. According to Kinzel, Brown then said, "if you can't work in the field, then you might as well go home." Discovery counters that "Kinzel did not return to work after the 2–3 days he said the doctor told him to be off."

On August 12 Kinzel filed a worker's compensation injury report. Brown signed the report on the same day, stating that "there was no injury—the employee does not like the work and has been reassigned." On August 12 Kinzel took a new note from Dr. Hagen to Brown; the note stated that Kinzel should not work until the end of August.

Brown claims that he understood Kinzel was to be off work only until the end of August. But on August 31 Brown signed a form containing Dr. Hagen's handwritten statement that indicated that Kinzel was to be off work until October 8 "pending orthopedic evaluation." Brown claims he never saw this statement and instead only signed the form where asked. The doctor's statement is a few lines above the section Brown filled out. Brown wrote "ALLEGED" under the form's reference to illness or injury.

In early September Brown terminated Kinzel's employment at Discovery. Brown eventually sent a letter to Kinzel explaining his reasons for the termination.[1] The letter states that the reasons

> pertinent to your discharge are your directly lying to me about the results of your doctors visit on August 3rd, 1998, including failure to give me the doctors note from that visit, and failure to return to work, to come by the office in person, or to call the office on September 1st, 1998 as was specified in a later doctors note that we did receive clearing you to return to work on that date. We received no further correspondence from you or notes from any doctors on your behalf. You clearly had no interest in maintaining your job or showing even common courtesy to your employer.

## PROCEEDINGS

Kinzel and his wife Cheryl filed the present suit against Discovery and Hart Crowser in October 1999, alleging retaliatory and constructive discharge claims against Discovery, multiple defamation claims against both defendants, an intentional interference with

---

1. The actual date of the letter is unknown. The letter is dated August 17, 1998, but it refers to events in September.

contract claim against Hart Crowser, and a negligence and a "cancer phobia"[2] claim against Hart Crowser. Because of summary judgment rulings, by the time of trial only one of Kinzel's defamation claims remained against each defendant, along with a fear of cancer claim against Hart Crowser and a wrongful termination claim against Discovery.

The jury rendered a verdict for both defendants on these claims.

Kinzel appeals.

## DISCUSSION

### Issues on Appeal

Kinzel raises numerous issues on appeal. The issues discussed in this opinion are set out below along with a summary of our resolution of each. Other issues are resolved summarily. They are listed in the margin along with a summary reason for our decision concerning each.[3]

1. Did the trial court err in failing to give a mixed-motive instruction on the retaliatory discharge claim? Yes, because the evidence was sufficiently strong that Kinzel was discharged for reasons that included a prohibited motive.

2. Did the trial court err in limiting Kinzel to two weeks severance pay for his retaliatory discharge claim? Yes, because a retaliatory discharge in violation of an explicit public policy gives rise to a tort as well as a contract claim.

3. Did the trial court err in granting summary judgment to Hart Crowser on Kinzel's

first defamation claim? Yes, the challenged statement could reasonably be interpreted as an assessment based upon factual underpinnings.

4. Did the trial court err in connection with instructing the jury regarding Kinzel's defamation claim against Discovery? There is no reversible error on this point. The error that was made was harmless and Kinzel's argument regarding an instruction that should have been given is considered abandoned because of inadequate briefing.

5. Did the trial court err in excluding medical testimony regarding Kinzel's back injury? No, the trial court's exclusionary rulings were correct when made and the court properly allowed such evidence when its relevance to Kinzel's defamation claim was argued.

6. Did the trial court err in granting Hart Crowser summary judgment on Kinzel's intentional interference with contract claim? Yes, there are genuine issues of material fact as to cause and privilege.

We proceed to a discussion of the above issues.

### 1. Mixed–Motive Instruction

■ Kinzel complained that Discovery wrongfully terminated him for his role in filing OSH complaints against Hart Crowser or for filing for worker's compensation benefits. At trial, the superior court gave the

---

2. In the complaint, this was simply addressed as injuries "from being exposed to harmful chemicals and dust at the site."

3. The following issues are resolved summarily:
1. Did the trial court err in determining that Kinzel could not recover damages for his back injury in tort against Discovery? No, recovery of damages for physical injury is barred by the exclusive remedy provision of the Workers' Compensation Act, AS 23.30.055, except for statutory claims or intentional torts.
2. Did the trial court err in excluding the testimony of employee relations expert Jan Duffy? No, the court's ruling was discretionary and no abuse of discretion has been demonstrated.
3. Did the trial court err in excluding the testimony of worksite safety expert Dennis Smythe? No, the court's ruling was discretion-

ary and no abuse of discretion has been demonstrated.
4. Was Kinzel substantially prejudiced during the trial by various interjections made by the court during his counsel's examination of witnesses and by imposing time restraints on counsel? No, the actions complained of were permissible efforts to bring the trial to a conclusion within a reasonable time and were neither unfair nor prejudicial.
5. Did the trial court err in instructing the jury as to the defamation claim against Hart Crowser? As the instructions in question were not objected to and they are not plain error, this argument has been waived.
6. Did the trial court err in granting summary judgment dismissing Kinzel's constructive discharge claim? No, because Kinzel did not resign, he was fired.

following jury instruction regarding this claim:

> In considering Discovery Drilling's reasons for terminating Jeffrey Kinzel, if you conclude that Discovery Drilling made its decision to terminate Jeffrey Kinzel in the good-faith belief that Jeffrey Kinzel had misrepresented the nature of the doctor's releases he'd obtained and a good-faith belief that Jeffrey Kinzel failed to return to work at the end of the period for which his doctor had released him, you may find that Discovery Drilling acted in good faith even if it [was] later discovered that the reasons for terminating Jeffrey Kinzel were mistaken.[4]

The special verdict form was worded:

> (16) Did Jeffrey Kinzel's filing of a workers' compensation claim have a determinative effect in Discovery Drilling's decision-making process in terminating his employment?
>
> . . . .
>
> (17) Did Jeffrey Kinzel's filing of a complaint with AKOSH have a determinative effect in Discovery Drilling's decision-making process in terminating his employment?

The jury answered no to both of these questions.

In *Veco, Inc. v. Rosebrock* we laid out the framework for retaliatory discharge claims.[5] To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that [the employee] was engaged in a protected activity;
>
> (2) that an adverse employment decision was made; and

(3) that there was a causal connection between the two.[6]

Quoting from *Miller v. Fairchild Industries, Inc.*,[7] we stated that "[c]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge. . . ."[8] Once a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate nonretaliatory explanation for the discharge. "To satisfy this burden, the employer 'need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'"[9] If the employer meets its burden of production by articulating a legitimate reason for terminating the employee, "then the burden shifts once again to the plaintiff to show that the defendant's proffered explanation is merely a pretext for discrimination."[10]

In this case Kinzel made a prima facie case of retaliation. He engaged in protected activities when he filed his OSH complaint and workers' compensation claim, and he was fired. The close proximity in time between these events gave rise to an inference of causation. Discovery articulated legitimate, nondiscriminatory reasons for firing Kinzel. Thus the burden shifted back to Kinzel to prove that these reasons were pretextual. The focus at trial was the motive for firing Kinzel. Were the reasons offered by Discovery genuine or pretextual?

Kinzel was not satisfied with the instructions that the court eventually gave and requested a mixed-motive instruction similar to the mixed-motive instruction in *Veco*.[11]

---

4. This instruction was based on an explanation in *Holland v. Union Oil Co. of California, Inc.*, 993 P.2d 1026 (Alaska 1999).

5. 970 P.2d 906 (Alaska 1999).

6. *Id.* at 921.

7. 797 F.2d 727, 730–31 (9th Cir.1986).

8. *Veco*, 970 P.2d at 919.

9. *Id.*

10. *Id.*

11. *Id.* at 919 n. 29. The mixed-motive instruction offered by Kinzel provided in relevant part:

> To prevail on his mixed-motive claim, Kinzel need not establish that his complaints constituted the sole motivation or even the primary motivation for Discovery Drilling's action. Plaintiff must prove that it is more likely than not that his complaints were a causal factor in his termination, even though Discovery Drilling may also have been motivated by other factors.
>
> If you find that Kinzel has proved that his OSHA complaint and/or worker's compensation claim was/were motivating factor(s) in his

In *Era Aviation, Inc. v. Lindfors*[12] we explained the nature and function of a mixed-motive instruction:

> In cases where there is direct evidence of discrimination, we instead apply a mixed-motive analysis, which recognizes that discriminatory employment decisions may not be motivated solely by a prohibited characteristic such as race or sex, but may be "based on a mixture of legitimate and illegitimate considerations." Under the mixed-motive framework, once the plaintiff has cleared the initial hurdle of presenting direct evidence of discriminatory intent, the plaintiff's ultimate burden of proof is somewhat relaxed: the jury is instructed that the plaintiff can prevail in a claim of discrimination by showing that gender was simply "a motivating factor," as opposed to the determinative factor, in the adverse employment decision. Still, gender must be a determinative cause, but the burden shifts to the employer on this point. The employer must show that it would have made the same decision even absent considerations of gender. Although the plaintiff may pursue mixed-motive and pretext claims simultaneously, if the jury finds no direct evidence of discrimination, it must find the defendant liable, if at all, under a pretext framework.[13]

As the above language makes clear, there must be "direct evidence" that the employer's conduct was motivated, at least in part, by a prohibited reason—in *Era* gender discrimination, in the present case retaliation because the employee filed an OSH claim or a worker's compensation claim. Kinzel argues that he met this requirement and Discovery argues that he did not.

The term "direct evidence" in the context of the mixed-motive methodology comes from the decision of the United States Supreme Court in *Price Waterhouse v. Hopkins*.[14] Courts subsequent to *Price Waterhouse* have struggled with the meaning of the term "direct." The Second Circuit has observed that "direct" should not be understood

> in its sense as antonym of "circumstantial," for that type of "direct" evidence as to a mental state is usually impossible to obtain:

>> "Direct evidence," it seems, is an unfortunate choice of terminology for the sort of proof needed to establish a "mixed-motives" case. "Direct" and "indirect" describe not the quality of the evidence presented, but the manner in which the plaintiff proves his case. Strictly speaking, the only "direct evidence" that a decision was made "because of" an impermissible factor would be an admission by the decisionmaker such as "I fired him because he was too old." Even a highly-probative statement like "You're fired, old man" still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision. But juries have always been allowed to draw such inferences.[15]

The Second Circuit takes the position that a plaintiff may prove that a forbidden animus was a motivating factor through either direct or circumstantial evidence so long as the circumstantial evidence is sufficiently strong. Mere statistical evidence would not warrant a mixed-motive charge, "nor would 'stray' remarks in the workplace by persons who are

---

termination, then you must find for Kinzel on his mixed motive wrongful termination claim, unless you also find that Discovery Drilling has proved that it is more likely than not that it would have made the same decision, if Kinzel had not complained to OSHA or filed a worker's compensation claim. If you find that Discovery Drilling would have made the same employment decision if Kinzel had not made his complaint, then you must find for Discovery Drilling on the mixed motive wrongful termination claim.

The fact that Kinzel was an "at will" employee who could be terminated without cause does not mean that Discovery Drilling could

terminate Kinzel because he complained to OSHA or filed a worker's compensation claim.

**12.** 17 P.3d 40 (Alaska 2000).

**13.** *Id.* at 44 (citations omitted).

**14.** 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

**15.** *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir.1992) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1185 (2d Cir. 1992)).

not involved in the pertinent decisionmaking process." [16]

The Second Circuit court in *Ostrowski* summarized its approach to mixed-motive cases as follows:

> In sum, if the plaintiff presents evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, and that evidence is sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision, the jury should be instructed that if it does draw that inference the plaintiff is entitled to recover unless the employer has established by a preponderance of the evidence that the employer would have taken the same action without consideration of the impermissible factor. The jury should also be instructed, in substance, that the "employer may not meet its burden in [a mixed-motives] case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason.... The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision." [17]

■ We agree with the Second Circuit's approach to the quantum of proof required in order to justify a mixed-motive instruction. We align ourselves with these views in recognition of the difficulty of proving that an unlawful motive impelled any particular employment decision and the desirability of implementing the statutory policy against retaliatory discharges. [18]

We discussed the sufficiency of the evidence for a mixed-motive instruction in *Era*. In *Era* we considered whether a plaintiff, who complained of gender discrimination, had presented enough evidence to warrant a mixed-motive instruction. [19] The evidence presented in that case involved two harsh statements directed toward the plaintiff in which she was told she "had no ... business being a captain" and that she would "never be a captain." [20] We noted that these statements could not be construed to be "direct evidence that sex was a factor" in Era's failure to promote the plaintiff. [21] While the statements were certainly clear that the Era decisionmaker had a strong view that the employee did not deserve a promotion, they were silent as to the reasons for this view. "Both statements are ambiguous—they can be interpreted in a discriminatory or benign way—and do not reflect directly on Era's discriminatory animus." [22]

Here, Kinzel argues that unlike the situation in *Era*, the evidence presented at trial revealed an animus based on his protected activity. At trial, Kinzel presented two e-mails written and sent by Brown to Craig Martin. The first e-mail was dated July 25, 1998. Brown wrote Martin:

> I understand that you have told Dave to have Jeff Kinzel removed from the site. I understand. Please confirm that request to me in writing. It can be by e-mail or fax. If you would include an official reason, that would be helpful. I do apologize for the recent events, however I was stuck in the middle between you and Jeff. I assume we might take up all that at a later time when the wound is not so fresh.

At trial, Brown was asked to explain what "wound" he was referring to in his message. Brown replied,

> Well, obviously, an OSHA investigation is an unpleasant arrangement in any regard. The things that they were looking into, Craig was clearly not happy about it. In a general sense, I don't know that anybody

---

16. *Id.* at 182.

17. *Id.* at 182–83 (quoting *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. 1775).

18. *See* AS 18.60.089(a) (prohibiting retaliation by an employer against an employee who has filed as OSH complaint); AS 23.30.247(a) (prohibiting discriminating against an employee who has filed a claim for workers' compensation).

19. *Era*, 17 P.3d at 44.

20. *Id.* at 45.

21. *Id.*

22. *Id.*

was happy about having to discontinue what they were doing and respond to the investigators' requirements.

In an e-mail dated August 13, 1998, to Martin, Brown wrote:

> Craig, I am sure that neither of us are happy about the way this project ended. It was a no win situation for absolutely everyone involved.... I just wanted to touch base after the initial pain had subsided a bit and say that I clearly tried too long to give Jeff [Kinzel] a chance to get over the details and see the big picture.... I will be paying for a long time for giving him a chance.

When Brown was asked at trial about his use of the words "initial pain," he acknowledged that he again was referring to the OSH investigation. He further testified that he was upset more about Kinzel's report to OSH than he was about the quality of his work.

Brown's e-mails and corresponding testimony reveal an animus based on Kinzel's OSH report. Brown characterized the actions of Kinzel as creating a "wound" and a "pain" in the relations between Discovery and Hart Crowser, and Brown's explanation at trial revealed he was upset with Kinzel for these actions: "So I guess what I was upset about was not the work." These facts distinguish this case from *Era*. In *Era*, the plaintiff failed to provide evidence of animus based on forbidden motives. Here, however, the evidence shows an animus triggered by Kinzel's safety complaints.

Although the e-mail statements by Brown as explained by his testimony directly reflect an animus against Kinzel based on Kinzel's protected conduct, was the evidence sufficient to permit a jury "to infer that that attitude was more likely than not a motivating factor in the employer's decision"?[23] We believe that it was sufficient. The e-mail evidence plainly suggests that at least one adverse employment decision was made by Brown because of Kinzel's OSH report: Kinzel's reassignment from the Fort Wainwright job to the more physically demanding job at Glennallen. Although this adverse employment action was not the one that was under review by the jury, Kinzel was fired a little more than a month after he was reassigned. If an improper motive played a role in the reassignment, there is little reason to think that it would have been dispelled at the time of Kinzel's firing.[24]

■ We conclude therefore that a mixed-motive instruction should have been given. But Discovery argues that the failure to give such an instruction was harmless error "as the jury found Kinzel's filing of a workers' compensation claim and an AKOSH complaint did not have a 'determinative effect in Discovery Drilling's decisionmaking process in terminating his employment.'" Discovery misses the point of a mixed-motive instruction. If the jury had been given a mixed-motive instruction, Kinzel would only have had to show that Discovery's prohibited motive was a motivating factor, though not necessarily a determinative one, in the decision to fire Kinzel. If the jury so found the burden would have shifted to Discovery to show that it would have fired Kinzel even if he had not initiated safety-related complaints on the Fort Wainwright job. By contrast, under the instructions as given, the burden was on Kinzel to show that his filing "had a determinative effect."[25] Since the jury's finding was not guided by an appropriate instruction, it does not show that the failure to give such an instruction was harmless.[26]

**23.** *Ostrowski*, 968 F.2d at 182.

**24.** *See Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993). The *Radabaugh* opinion in discussing *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990), noted:

> The court rejected the employer's argument that it was significant that [a comment by a decisionmaker that he would not hire blacks] referred to hiring rather than promoting blacks, reasoning that the statement indicated "a decidedly negative attitude toward black people" on the part of one of the people responsible for promotions and that there was "no reason to think that [this attitude differed] from hiring to promotion."

997 F.2d at 449.

**25.** Instruction 25 as given by the superior court.

**26.** We agree with Discovery that there was not sufficient evidence to justify a mixed-motive instruction relating to Kinzel's filing of a workers' compensation claim.

## 2. Limiting Lost Wages to Two Weeks

█ The superior court ruled that since Kinzel was an at-will employee subject to termination upon two weeks notice without cause, Kinzel was entitled to lost wages for no more than two weeks pay. Kinzel claims that this limitation was erroneous because his retaliatory discharge action should be considered an action in tort rather than contract. He argues that it follows from the tort nature of his claim that his lost wages claim should not be limited to the.two-week notice period and further that emotional distress damages, loss of consortium damages, and punitive damages were eliminated by the court's ruling that his retaliation claim could only be recognized in contract.

Discovery responds that this argument is not a basis for reversal since it relates only to the measure of damages and the jury found for Discovery on the liability issues relating to the wrongful termination claim. Discovery also argues that breaches of the covenant of good faith and fair dealing have consistently been held to be contract actions in Alaska, that the proper measure of damages in a wrongful termination contract case is the employee's reasonable expectations, and that Kinzel's reasonable expectations did not extend beyond the two-week notice of termination period to which he was entitled as an at-will employee.

In reply, Kinzel argues that if at-will employees were limited to two weeks severance pay on claims for retaliatory discharge this "would actually encourage employers to fire at-will employees who reported to OSH; the consequences to the employer would be slight and the incentive to be rid of a gadfly would be great." Kinzel also contends that in virtually every state that has considered the issue, employer retaliation for filing a safety-related complaint is considered a tort, that the measure of damages for the tortious discharge of an at-will employee is based on the employee's expectation of continued employment, and relevant to this is the employ-

ee's past history with the company. He notes that he had worked for Discovery for nearly six years and thus his expectation of continued employment could not fairly be limited to two weeks.

Discovery is correct that this issue is not grounds for reversal. It relates to damages only, and the jury returned a no-liability verdict. But since the verdict must be reversed on other grounds, we believe that it is advisable to address the issue briefly for guidance upon retrial.

In *Reed v. Municipality of Anchorage* an employee alleged that he had been fired in retaliation for filing a job safety complaint.[27] We held that the whistleblower statute, AS 18.60.089, does not confer a private cause of action, but that the employee had a common law remedy for his retaliatory discharge claim.[28] He alleged that his termination for whistleblowing was a violation of the covenant of good faith and fair dealing that is implied in employment contracts.[29] We agreed. In so ruling we did not imply that the employee's claim was not also a tort claim. The employee apparently only sought recognition of his claim as one sounding in contract. In reaching our conclusion that AS 18.60.089 did not preclude a suit for retaliatory discharge we noted that our conclusion was similar to the conclusion reached by the New Jersey Supreme Court in *Cerracchio v. Alden Leeds, Inc.*,[30] which permitted a "tort action to recover damages based upon [the employee's] discharge in violation of the public policy of this state...."[31]

In *ARCO Alaska, Inc. v. Akers* the issue was whether "this state will permit tort recovery when the implied covenant of good faith and fair dealing is breached in an employment contract and the breach violates no explicit public policy."[32] We answered this question in the negative. But we specifically stated that we were not deciding whether a

27. 782 P.2d 1155 (Alaska 1989).

28. *Id.* at 1159.

29. *Id.* at 1158.

30. 223 N.J.Super. 435, 538 A.2d 1292 (1988).

31. *Reed,* 782 P.2d at 1159.

32. 753 P.2d 1150, 1153 (Alaska 1988).

tort claim could be maintained where a discharge violated an explicit public policy.[33]

In *Central Bering Sea Fishermen's Association v. Anderson* an employee with a one-year contract brought a claim for, among other theories, constructive retaliatory discharge.[34] We did not indicate whether we considered this claim to sound in tort or contract. We held that damages should be limited to the unexpired term of the contract, citing the "normal rule" that a "wrongfully discharged employee is entitled to the total amount of the agreed upon salary for the unexpired term of his employment."[35] We recognized "that cases may exist where the specific term of an employment contract should not limit lost earnings damages."[36] But we held that the employee's claim in *Anderson* was not such a case because the employee "was to occupy a new position in a new company created by a new government program, allocating shares in a volatile industry."[37]

In the present case violations of explicit public policies—protection of whistleblowers who file safety complaints or workers who file workers' compensation claims—are alleged.[38] In these circumstances we believe that it is appropriate to allow a tort remedy to more effectively deter prohibited conduct. We thus join the numerous authorities that have so ruled.[39] The parties have only touched on what the appropriate measure of damages for lost wages would be for the tortious discharge of a whistleblower. We decline to attempt a definitive ruling on this subject based on the briefing before us. Instead, this is a subject that should be addressed on remand.

### 3. First Defamation Claim Against Hart Crowser

Kinzel brought defamation claims against Hart Crowser based on two different statements made by Craig Martin. One of the claims was dismissed on summary judgment, while the other claim was tried and the jury found in favor of Hart Crowser. We discuss here the summary judgment decision as to the first claim.

■ We review grants of summary judgment de novo and in the light most favorable to the non-moving party.[40] Summary judgment is upheld if the evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[41] The party opposing summary judg-

---

**33.** *Id.*

**34.** 54 P.3d 271 (Alaska 2002).

**35.** *Id.* at 278 (quoting *Skagway City Sch. Bd. v. Davis*, 543 P.2d 218, 225 (Alaska 1975)).

**36.** *Id.* As support for this proposition we cited a case where lost earnings under a specified-term contract were not limited to the term where there had been a long series of similar contracts. *Id.* at n. 21 (citing *Allen v. Cornish & Carey*, 1997 WL 195433, at *6–*7 (N.D.Cal., Apr.11, 1997)).

**37.** *Id.* at 279.

**38.** *See* AS 18.60.089(a), which prohibits retribution against discharging or discriminating against an employee because the employee has filed a safety complaint, and AS 23.30.247(a), prohibiting retaliation for filing a workers' compensation claim.

**39.** Many states have held that the termination of an employee in violation of fundamental public policy principles gives rise to a tort remedy. *See, e.g., Fielder v. Southco, Inc. of South Carolina,* 699 F.Supp. 577, 578 (W.D.Va.1988) (public policy doctrine enforced in claim for wrongful dis-

charge in retaliation for filing sexual harassment claim); *Cabesuela v. Browning–Ferris Indus. of Calif., Inc.,* 68 Cal.App.4th 101, 80 Cal.Rptr.2d 60, 63 (1998) (tort remedy available to employee who was terminated for protesting unsafe working conditions); *Hobson v. McLean Hosp. Corp.,* 402 Mass. 413, 522 N.E.2d 975, 977 (1988) (tort claim available to employee who was discharged for enforcing state and municipal safety laws); *Cerracchio v. Alden Leeds, Inc.,* 223 N.J.Super. 435, 538 A.2d 1292 (1988) (tort remedy available for employee who was terminated for filing OSHA and worker's compensation claims); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (tort claim recognized for employee who was allegedly discharged for serving on jury duty). For a more thorough analysis on the jurisdictions that have adopted the public policy exception, and particularly those that have utilized the exception in the "whistleblower" context, *see* DANIEL P. WESTMAN, WHISTLEBLOWING· THE LAW OF RETALIATORY DISCHARGE 198–211 (App.D) (1991).

**40.** *Beilgard v. State,* 896 P.2d 230, 233 (Alaska 1995); *see also Ellis v. City of Valdez,* 686 P.2d 700, 702 (Alaska 1984).

**41.** *Ellis,* 686 P.2d at 702; Alaska R. Civ. P. 56(c).

ment need not establish that it will ultimately prevail at trial, but only that there exists a genuine issue of fact to be litigated.[42]

■ Kinzel claims as error the superior court's grant of summary judgment for Hart Crowser on Kinzel's first defamation claim. Kinzel asserts that Hart Crowser's Martin made defamatory statements about Kinzel in an e-mail to Kyle Brown. The e-mail read:

In light of the issues that we have had to deal with during the 8 Car Header installation, I think that it would be better if you didn't have Jeff up here. The air sparge line issue (not installing the black iron pipe) was apparently done during the last few days that he was here and *I wonder if it was deliberate.* Like to hear your thoughts on the subject. (Emphasis added.)

In ruling, the superior court did not give reasons for granting Hart Crowser's motion for summary judgment. Kinzel speculates that the basis of the ruling was that "the statement was protected 'opinion' speech," and argues that a fact-opinion dichotomy is misguided. Hart Crowser argues that there are two legitimate bases upon which the court could have ruled: (1) the statement was incapable of being proven false, or (2) the statement was privileged.

Kinzel argues that a statement is defamatory if it implies underlying factual knowledge, even if it is allegedly expressed as an "opinion." Kinzel thus anticipates Hart Crowser's defense that expressions of opinion are always protected speech. In dealing with the fact/opinion distinction, we are guided by the United States Supreme Court in *Milkovich v. Lorain Journal Co.*[43] and our own opinion in *Sands v. Living Word Fellowship.*[44]

In *Milkovich*, the United States Supreme Court was concerned with a common misinterpretation of dicta in one of its earlier cases, *Gertz v. Robert Welch, Inc.*[45] Some courts asserted that *Gertz* stood for the proposition that opinion could never qualify as defamation.[46] But as *Milkovich* explained:

we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled "opinion." Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of "opinion" may often imply an assertion of objective fact.[47]

In *Sands* we acknowledged *Milkovich* and *Gertz* and determined that the real distinction is not between opinions and facts, but between statements represented as "expressions of ideas" and statements purporting to represent facts:

The First Amendment bars actions for defamation where the allegedly defamatory statements are expressions of ideas and "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695; *see Gertz*, 418 U.S. at 339, 94 S.Ct. 2997. If the context demonstrates to the audience that the speaker is not purporting to state or imply actual, known facts, then the speech is protected by the First Amendment.[48]

This interpretation is supported by the Restatement of Torts[49] and Keeton.[50]

---

**42.** *Alaska Rent–A–Car, Inc. v. Ford Motor Co.*, 526 P.2d 1136, 1138 (Alaska 1974).

**43.** 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

**44.** 34 P.3d 955 (Alaska 2001).

**45.** 418 U.S. 323, 339–340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The passage in question reads:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But

there is no constitutional value in false statements of fact.

**46.** *Milkovich*, 497 U.S. at 18, 110 S.Ct. 2695 (citing *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 61 (2d Cir.1980)).

**47.** *Id.* (citing *Cianci*, 639 F.2d at 62 n. 10).

**48.** *Sands*, 34 P.3d at 960.

**49.** *See* Restatement (Second) of Torts § 566 (1977).

**50.** W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 113A, at 814–15 (5th ed.1984).

The Seventh Circuit has stated, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."[51] The First Circuit has further explained that some statements are protected opinion speech "not because [they are] vague or judgmental but because [they are] speculative":

> The test, admittedly a very crude one, is whether the statement is properly understood as purely speculation or, alternatively, implies that the speaker or writer has concrete facts that confirm or underpin the truth of the speculation. *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir.1997); RESTATEMENT (SECOND) OF TORTS § 566, comment (c) at 173. The former is protected as opinion; the latter is taken as an indirect assertion of truth.[52]

In *Lyons v. Globe Newspaper Co.* the Supreme Judicial Court of Massachusetts considered whether a newspaper report on picketing outside a political convention defamed the picketers' union when it recounted a "suspicion" that the picketers were attempting to disrupt the convention in order to subvert rules which threatened the candidacy of a politician they supported.[53] The court detailed its process in distinguishing between fact and opinion:

> The court must examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which

the statement is disseminated and the audience to which it is published.[54]

The court concluded that the article was not defamatory.[55] It found that the word "suspicion . . . plainly cautioned the reader that the article referred to a theory rather than to facts."[56] It also noted that the suspicion was but one of "three alternative explanations for the picketers' motives, thereby confirming that the writer was engaging in speculation."[57]

Here, Martin's language could be interpreted as signaling that he was simply theorizing when he said "I wonder." He also revealed that he did not consider his theory anything more than a suspicion when he queried Brown for his own "thoughts on the subject." In its totality, Martin's e-mail can reasonably be construed as nothing more than conjecture. Under this interpretation, Martin's language would not be read as a statement of fact and did not imply that Martin had actual facts that form the basis for the conjecture. For these reasons the statement could reasonably be determined as not defamatory.

On the other hand, in reviewing a summary judgment ruling we view the record in its entirety, and draw all reasonable inferences in favor of the non-moving party.[58] An alternative and also reasonable interpretation would be to view Martin's June 24 e-mail as insinuating that Kinzel was responsible for sabotaging the worksite. Given Martin's supervisory position, he was in a better position than Brown to know the factual details of the "Car Header installation" and "air sparge line issue." For this reason, Martin's "wonder" could reasonably be understood as hav-

Keeton argues "that a distinction should be made between an evaluative-type opinion and the deductive type," the latter actually imputing facts that can be proven false and thus potentially actionable. *Id.*

**51.** *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993).

**52.** *Gray v. St. Martin's Press, Inc.,* 221 F.3d 243, 250 (1st Cir.2000).

**53.** 415 Mass. 258, 612 N.E.2d 1158, 1160 (1993).

**54.** *Id.* at 1162 (citations omitted).

**55.** *Id.*

**56.** *Id.*

**57.** *Id.*

**58.** *See American Restaurant Group v. Clark,* 889 P.2d 595, 597–98 (Alaska 1995); *Bennett v. Hedglin,* 995 P.2d 668, 671 (Alaska 2000).

ing a factual underpinning and thus make the e-mail susceptible to a defamation claim.

Since one might reasonably interpret the facts here in favor of Kinzel's defamation claim, we must conclude that the superior court erred in dismissing Kinzel's claim on summary judgment and remand the case for further proceedings on this issue.

### 4. Defamation Claim Against Discovery

Kinzel sued Discovery for defamation arising out of an e-mail Kyle Brown wrote to Craig Martin on December 16, 1998:

> Just for your information, Jeff [Kinzel] filed a bogus work comp claim (alleged back injury on a different site) a few days after he left Fbx and has not worked a minute since.

At trial, the jury found in favor of Discovery on this claim. The jury could not agree whether the "bogus" statement was true or false,[59] but decided that Brown did not know, nor should he have reasonably known, that the statement was false. Kinzel appeals claiming that his expert witnesses were improperly excluded and the jury was erroneously instructed.

We conclude that no error was committed concerning the exclusion of expert witnesses because Kinzel was allowed to present expert testimony that his claim was genuine rather than bogus. This reason is examined in more detail in the next section. In this section we deal with Kinzel's claim concerning the jury instructions.

 Kinzel leads off by claiming that the jury should not have been instructed at all as to whether his claim was bogus. Instead, he claims that he was entitled to a directed verdict that his claim was not bogus.

Discovery does not counter this argument other than to say that it is too cursory and therefore has been abandoned. Kinzel's argument on this point is cursory. But he makes the essential point in his opening brief that Discovery did not contradict the validity of his claim, and this appears to be true.

Although Kinzel may have been entitled to a directed verdict instructing the jury that Brown's statement that his claim was bogus was false, the error was harmless. The jury's finding that Brown did not act negligently in making the statement renders the error concerning failing to direct a verdict as to the falsity of the statement irrelevant. Fault amounting at least to negligence is an essential element of a defamation claim.[60] Since it was found not to exist, the claim necessarily fails.

 Kinzel also claims that an instruction on duty to investigate was requested but refused. He claims that without such investigation Brown could not be said to have acted reasonably. Since a person who makes an unprivileged defamatory statement that is false is liable unless he reasonably believes it to be true, an instruction explaining that such a person has an obligation to use due care to ascertain the truth or falsity of his statement might have been appropriate. But Kinzel's briefing on this point is inadequate. He has not demonstrated that the instruction he offered is a correct statement of the law or that the instructions given by the court were erroneous or incomplete.[61]

### 5. Exclusion of Medical Testimony Regarding the Nature of Kinzel's Back Injuries

. Kinzel argues that the court erred by excluding evidence as to the nature of his work-related back injury. He claims that

---

**59.** The jury wrote opposite the question whether Brown's statement as to the bogus claim was false: "(4–8) noanswer."

**60.** *French v. Jadon, Inc.*, 911 P.2d 20, 32 (Alaska 1996) ("To prevail on a defamation claim, a plaintiff has to establish (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either 'per se' actionability or special harm.").

**61.** See *Great Divide Ins. Co. v. Carpenter ex rel. Reed*, 79 P.3d 599, 608 n. 10 (Alaska 2003) ("Points that are inadequately briefed are considered waived."); and *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 ("When, in the argument portion of a brief, a major point has been given no more than cursory statement, we will not consider it further. Failure to argue a point constitutes an abandonment of it.").

this evidence was relevant to show the falsity of Brown's defamatory statement that his workers' compensation claim was "bogus." Further he contends that the evidence should have been admitted to rebut evidence that his injury was feigned in order to develop claims against Discovery and Hart Crowser.

But the sequence of events at the trial convinces us that the court did not err. The court initially excluded detailed evidence of Kinzel's back injury based on the court's view that he could not recover in the present case for the injury because of the exclusive remedy clause of the workers' compensation act. The evidence was offered initially by Kinzel only on the question of damages, and the court did not err in excluding it on relevancy grounds based on this offer. Later in the trial Kinzel argued that the evidence was important to his defamation claim to show that the falsity of Brown's statement that his workers' compensation claim was bogus. After much argument the trial court correctly ruled that the testimony of Dr. Howard as to the nature of Kinzel's injuries would be admitted. Dr. Howard testified that in his opinion Kinzel had a valid workers' compensation claim. Dr. Howard also testified that if Brown had consulted with a physician as to whether Kinzel's claim was valid or bogus, a reasonable physician would have said that it was a valid claim. Kinzel did not seek to introduce additional evidence as to his injury after this testimony.

Subsequent to Dr. Howard's testimony, evidence that Kinzel had been planning a lawsuit was presented by the defendants. Once the evidence was presented Kinzel could have moved to introduce evidence of the nature and seriousness of his back injury in order to rebut the defense position that his was a trumped-up claim. But he appears not to have done this. Under the circumstances, we can identify no ruling by the trial court that was erroneous.

### 6. Interference with Contract Claim Against Hart Crowser

■ Discovery removed Kinzel from the Fort Wainwright site at the specific request of Hart Crowser's Martin. Discovery then reassigned Kinzel an arduous job, which he

claims was meant to be punitive and was an effort to force him to resign. Soon thereafter he injured his back and left work. In early September, Kinzel was fired by Discovery.

In his complaint, Kinzel alleged that Martin made false, defamatory, and otherwise harmful statements to Brown, thereby "inveigl[ing], encourag[ing] and extort[ing] plaintiff's employer to get rid of and discharge plaintiff." This, Kinzel asserted, amounted to an improper interference with his Discovery employment contract by Hart Crowser.

Hart Crowser moved for summary judgment on this issue, arguing that Kinzel had been terminated by his employer Discovery for reasons wholly unrelated to the Hart Crowser project at Fort Wainwright. Attached to this motion was a sworn affidavit from Brown. Brown attested that:

> I was solely responsible for the decision to assign Mr. Kinzel to the Glennallen work site.... Hart Crowser had no input in my decision.... Furthermore, my decision to assign Mr. Kinzel to the Glennallen job as opposed to some other project was in no way influenced by Hart Crowser's request that Mr. Kinzel be removed from the Ft. Wainwright job.

Brown further insisted that Kinzel would have been removed from the Wainwright site within a week anyway since that job was nearing completion. He concluded, "[a]fter Mr. Kinzel was removed from the Ft. Wainwright project Hart Crowser had no involvement in any aspect of Mr. Kinzel's employment."

In his opposition motion, Kinzel attempted to link his efforts to improve safety at the Fort Wainwright site with his eventual termination. He accused Martin of seriously undermining Kinzel's position at Discovery by means of a series of damaging and at times defamatory e-mails. This, according to Kinzel, led to his removal from Fort Wainwright and his eventual termination.

Prior to trial the superior court granted Hart Crowser's motion for summary judgment on this intentional interference with contract claim. The court gave no reasons

for its decision. Kinzel claims that there are material facts in dispute as to whether Hart Crowser interfered with his employment at Discovery.

■ To prevail on an intentional interference with contract claim, a plaintiff must prove: (1) the existence of a contract; (2) the defendant was aware of the contract; (3) the contract was breached; (4) the defendant's conduct was the cause of that breach; (5) the damages; and (6) the defendant's conduct was not privileged.[62]

■ We have recognized that this tort applies to terminable at-will contracts:

> though a contract is terminable at will, a claim of unjustifiable interference can still be made, for "(t)he wrong for which the courts may give redress includes also the procurement of the termination of a contract which otherwise would have (been) continued in effect." [63]

■ Hart Crowser points out that many of Kinzel's arguments are inappropriate because they refer to trial testimony. In this discussion we only consider facts available to the trial court at the time of its ruling,[64] but we also note that the trial court had a duty to examine the existing record (including the aforementioned e-mails) in its entirety before determining that no genuine issue of material fact existed.[65]

Hart Crowser claims that Kinzel presented no evidence in his opposition to Hart Crowser's motion for summary judgment demonstrating that Hart Crowser, and specifically Martin, had induced Discovery to terminate Kinzel. It further claims that the only relevant evidence presented to the superior court was the affidavit of Brown, confirming that Kinzel was terminated for reasons particular to Discovery and wholly unrelated to the project at Fort Wainwright and Hart Crow-

ser. But the e-mails between Martin and Brown, when viewed in a light most favorable to Kinzel,[66] show that Martin was responsible for Kinzel's firing.

In a June 24 e-mail Martin comments to Brown that "it would be better if you didn't have Jeff up here." He further insinuates that Kinzel was responsible for sabotaging the worksite. Martin's subsequent e-mails demonstrate a pattern of attempts at undermining Kinzel's desirability as an employee:

> I think it is very unwise to have these guys complaining to everyone they meet about the unsafe work conditions that Hart Crowser forces them to work under ... one of our clients [might not find it humorous].
>
> We will give Jeff (or whoever is up here) [a group of tasks to accomplish].
>
> TOP THREE WHINES OF THE WEEK [all mentioning Jeff Kinzel].
>
> I have grave concerns about Jeff doing good work at a reasonable productive level at this point.

Brown eventually recalled Kinzel from the worksite after Martin asked that Kinzel be removed. When Martin asked Brown to remove Kinzel from the site, Brown asked for an "official reason," stating that it would be "helpful." Martin's reply did not mention Kinzel's lack of productivity, or "whining" about health hazards, or any other past complaint. Rather than these themes, Martin accused Kinzel of not wearing a respirator. Further, since respirators were no longer required by the time Martin responded, he also referred to "other Health & Safety concerns in regards to Jeff." Despite not specifying what these were, he stated that he would have no choice but to shut down the job if Kinzel were not removed: "My only other option will be to shut the project down, if we cannot ensure safety at the site. Removing

**62.** See *Briggs v. Newton*, 984 P.2d 1113, 1119 (Alaska 1999).

**63.** *Alyeska Pipeline Serv. Co. v. Aurora Air Serv., Inc.*, 604 P.2d 1090, 1093 (Alaska 1979) (*quoting Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E.2d 282, 290–91 (1976)).

**64.** See *Kaiser v. Sakata*, 40 P.3d 800, 805 (Alaska 2002).

**65.** *American Restaurant Group v. Clark*, 889 P.2d 595, 597–98 (Alaska 1995).

**66.** *Ellis v. City of Valdez*, 686 P.2d 700, 702 (Alaska 1984); *see also Beilgard v. State*, 896 P.2d 230, 233 (Alaska 1995).

Jeff from the site is your decision." Given the lack of any specified present safety concerns and Martin's history of finding fault with Kinzel, the totality of the evidence casts doubt on the veracity of the "official reason."

Hart Crowser nevertheless insists that causation is impossible to prove in this case. It argues that, though a lapse in time between interference and termination is not fatal to these claims, what is fatal is when intervening events make it highly unlikely that defendant's conduct could have caused the termination. Hart Crowser claims that there were several intervening occurrences prior to Kinzel's termination all of which demonstrate a separate cause of termination, such as Kinzel's injury and his failure to return to work.

But the e-mails demonstrate that the safety complaints put a strain on the relationship between Hart Crowser and Discovery. Brown, anxious to maintain business, quickly expressed a desire to patch things up as soon as possible. As early as July, just after Kinzel was recalled from Fort Wainwright, Brown e-mailed Martin, "I assume we might take up all that at a later time when the wound is not so fresh." On August 13 Brown further urges, "I would hope that it's not something that you hold against me forever." This tends to show that Hart Crowser still had an influence over Discovery after Kinzel's removal from the Fort Wainwright job but before his eventual termination in September. In subsequent e-mails of December 16, 1998, and March 23, 1999, Brown was still making amends to Martin for Kinzel's complaints. Although the e-mails do not conclusively prove that Discovery's termination of Kinzel was based upon Martin's complaints to Brown, they clearly raise a genuine issue of material fact on that point.

It is also a question of fact whether Hart Crowser's actions against Kinzel were privileged. "[W]here there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated

by spite, malice, or some other improper objective."[67] Here there is no question that Hart Crowser as contractor had a direct financial interest in the relationship between its subcontractor Discovery and Kinzel, so long as Kinzel was employed on the Fort Wainwright project. But the question remains whether Martin's e-mails were intended to achieve an improper objective such as removal of Kinzel in retaliation for Kinzel's safety complaints. If so, no claim of privilege could be maintained.

In conclusion, because material facts are in dispute as to causation and privilege, the superior court's grant of summary judgment cannot be sustained.

## CONCLUSION

Kinzel was entitled to a mixed-motive instruction on his claim for retaliatory discharge against Discovery. Summary judgment was improperly granted in favor of Hart Crowser on Kinzel's claims for defamation and intentional interference with contract rights. The judgments in favor of Discovery and Hart Crowser must therefore be reversed. This case is remanded for further proceedings concerning Kinzel's claims of retaliatory discharge, defamation (against Hart Crowser), and intentional interference with contract rights.

REVERSED and REMANDED.

---

**67.** *RAN Corp. v. Hudesman*, 823 P.2d 646, 649 (Alaska 1991).