Bonita **MAHAN**, Appellant,

v.

**ARCTIC CATERING, INC., Ricardo Gobaleza, and Todd Harris,** Appellees.

No. S–11184.

Supreme Court of Alaska.

April 21, 2006.

---

Hugh W. Fleischer, Law Offices of Hugh W. Fleischer, Anchorage, for Appellant.

Laura L. Farley, Farley & Graves, P.C., Anchorage, for Appellees.

Before BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Bonita Mahan worked for Arctic Catering on two occasions: once in 1999 and again in

2000. Mahan claims that during her first period of work, two of her supervisors sexually harassed her. During her second period of work, in 2000, Mahan was fired after working only ten days. Nearly two years later Mahan sued Arctic, claiming sexual harassment and wrongful termination. The superior court granted Arctic summary judgment, dismissing Mahan's claims for sexual harassment because they were time-barred, and dismissing her wrongful termination claim because it was unsupported. Mahan appeals, challenging these rulings. We affirm, holding that Mahan presented no evidence of harassment occurring within the statutory time limit and failed to raise any genuine issues of material fact supporting her claim for wrongful termination.

## II. FACTS AND PROCEEDINGS

Bonita Mahan worked as an at-will employee for Arctic Catering on two separate occasions. She first worked as a housekeeper at the Badami camp on the North Slope from January 25, 1999, until March 11, 1999. Mahan's supervisors there were Doug Schneider and Ricardo Gobaleza. While she was at Badami, Mahan claims, Gobaleza made several sexual comments to her; she consistently rejected his sexual advances. Mahan alleges that she complained about Gobaleza to Todd Harris, Arctic's operations manager, but Harris reacted by joining in the harassment. Mahan quit her job with Arctic on March 11, 1999, because of a rash that she suffered after her skin reacted to laundry soap and because the person she was filling in for returned to work.

Arctic rehired Mahan the following year, and she began work at the Alpine camp on March 5, 2000. On March 16, 2000, Mahan's supervisor, Scott Laney, fired her, stating that she could not perform "necessary duties of her position."

On March 14, 2002, Mahan filed a complaint in the superior court against Arctic, Gobaleza, and Harris for sexual harassment and wrongful termination.[1] Arctic moved

---

1. Mahan's complaint also included claims for     defamation and intentional infliction of emotion-

for summary judgment, asserting that Mahan's claim for sexual harassment was barred by the statute of limitations. Arctic further asserted that Mahan failed to present any evidence to support her claim for wrongful termination. The superior court dismissed Mahan's sexual harassment claim as untimely, finding that a sexual harassment claim must be brought within two years of the harassment's occurrence and that Mahan had alleged no act of harassment occurring less than two years before March 14, 2002—the date she filed her complaint. The court also dismissed Mahan's wrongful termination claim, finding that she had failed to present any evidence tending to show that Arctic terminated her for improper or pretextual reasons.

Mahan appeals.

## III. DISCUSSION

### A. Standard of Review

■ A trial court may grant a motion for summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[2] We review *de novo* a trial court's order granting summary judgment,[3] viewing all reasonable inferences in the light most favorable to the non-moving party[4] and considering "affidavits, depositions, admissions,

answers to interrogatories and similar material to determine ... whether there are any ... triable genuine issues of material fact."[5]

### B. Sexual Harassment Claim

■ Alaska law prohibits an employer from discriminating against a person because of the person's sex.[6] We have held that this law prohibits sexual harassment against employees.[7] Alaska Statute 09.10.070 requires that claims for sexual harassment be brought within two years of the wrongful conduct's occurrence.[8] The two-year limit starts when a party knows or should have known of a claim—usually the date that the alleged incident occurs.[9] Mahan filed her claim on March 14, 2002. Barring some basis for extending the statutory period, then, her sexual harassment claim would be limited to acts occurring within the two years preceding this filing date.

Mahan testified in her deposition that almost all the incidents of sexual harassment occurred at Arctic's Badami camp during her first period of employment—between January 25 and March 11, 1999. She stated that Richard Gobaleza first made sexual comments to her soon after he began working as her supervisor at Badami in February 1999. Mahan claimed that she eventually told Todd Harris, Arctic's operations manager, about Gobaleza's comments, "but [he] seemed like

---

al distress. Mahan later withdrew her defamation claim. Because Mahan's IIED claim relies on her claim for sexual harassment, we need not discuss it separately here.

2. *In re Estate of Evans*, 901 P.2d 1138, 1140 (Alaska 1995).

3. *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1317 n. 7 (Alaska 1994).

4. *R.E. v. State*, 878 P.2d 1341, 1345 (Alaska 1994).

5. *French v. Jadon, Inc.*, 911 P.2d 20, 24 (Alaska 1996) (internal citations omitted) (citing *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1215 (Alaska 1991)).

6. AS 18.80.220(a)(1) provides that it is unlawful for:

an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employ-

ment because of the person's race, religion, color, or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood.

7. *See French*, 911 P.2d at 28.

8. The relevant portion of AS 09.10.070 provides in part:

(a) Except as otherwise provided by law, a person may not bring an action ...
(5) upon a liability created by statute, other than a penalty or forfeiture; *unless the action is commenced within two years of the accrual of the cause of action.*
(Emphasis added.)

9. *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1249 (Alaska 2001).

he didn't care." According to Mahan, Harris began making sexual comments to her as well, and the harassment by both men continued until Mahan left Badami on March 11. Because this alleged harassment all occurred more than two years before Mahan filed her complaint, her sexual harassment claim was time-barred to the extent that it was based on the Badami camp incidents.

Mahan did describe one incident of possible sexual harassment by Gobaleza that occurred at Alpine camp during her second period of employment. She testified at her deposition that when Gobaleza first saw her at Arctic, he hugged her and asked how she was doing. When asked at the deposition if she thought this conduct was inappropriate, Mahan initially insisted that she was unable to respond, saying, "I don't know how to answer that question," "I don't know," and "I can't answer." She then added, "I guess, when he rubbed his hand down by my bra strap, when he went to give a hug, that's inappropriate; if he was just giving me a hug, that's not." In a supplemental affidavit filed two months after her deposition, Mahan specified that this incident occurred "at least seven days prior to March 16, 2000"—that is, sometime before March 9, 2000.

In responding to a written interrogatory before testifying at her deposition, Mahan also had claimed to remember a sexually harassing remark that Harris made to her one morning at Alpine camp; but she could not pin this incident to any specific date. Later, at her deposition, Mahan did not mention this incident and recalled only one episode of possible sexual harassment at Alpine: Gobaleza's hug. Although Mahan testified that she remembered seeing Harris at Alpine camp the day she was fired and that she thought he had been there earlier as well, she acknowledged: "But I can't remember how many days or anything." When asked if Harris said or did anything at Arctic that she considered harassment, Mahan replied, "I can't remember right now. Whatever I had put on the paperwork, that's what it was." In testifying about the difficulties at Alpine that led up to her termination, Mahan did not claim that any new acts of harassment at

Alpine contributed to her firing; to the contrary, she specifically attributed her firing to the harassment she had experienced the year before at Badami: "I was terminated because of what happened in the past, at Badami. . . . Because I was sexually harassed by Todd Harris and by Ricardo. And I guess they—it reminded them of it every time they'd see me anyplace else." Although Mahan's post-deposition affidavit specified that Gobaleza's hug occurred before March 9, 2000, the affidavit omitted any mention of her pre-deposition claim that Harris had made a sexually harassing comment to her at Alpine.

Even construing the totality of this evidence in Mahan's favor for summary judgment purposes, we find no substantial evidence of any incident of sexual harassment occurring within the two-year period before March 14, 2002, the date Mahan filed her complaint. By Mahan's own account, the Gobaleza "hug" occurred sometime before March 9, 2000—several days outside the two-year statutory limit. Mahan's initial interrogatory responses included an additional claim that Harris made a sexually harassing remark to her at Alpine. But Mahan acknowledged that this remark occurred on some "date unknown." At her subsequent deposition, Mahan could not recall this allegation and she provided no further information about it in her supplemental affidavit. Given these circumstances, we think that it would be sheer speculation to assume that Harris's alleged comment at Alpine occurred sometime within the three-day span between March 14, 2000 (the outside limit of the statutory filing period), and Mahan's termination on March 16, 2000.

█ In fact, Mahan does not seriously contest this point. She insists instead that because her case involves a continuous course of "severe and pervasive sexual harassment," the continuing violations doctrine resurrects her claim. Under this doctrine, certain patterns of ongoing discriminatory conduct can preserve a sexual harassment claim that might otherwise be time-barred.[10] To benefit from this theory, though, "a plaintiff must

---

10. *Sengupta,* 21 P.3d at 1249.

first demonstrate that some discriminatory act occurred within the limitations period. The plaintiff must then show that the timely filed claim—based upon this act within the limitation period—is closely related to the otherwise time-barred claims." [11] Upon making this showing, the plaintiff can use evidence of earlier events to prove the defendant's liability for the acts within the statutory period. [12]

But here, as we have already mentioned above, Mahan has failed to show any acts of sexual harassment occurring within two years of her complaint. And the only evidence of other discriminatory acts she offers is the evidence she relies on to support her wrongful termination claim. Because Mahan's sexual harassment claim ultimately depends on the same evidence as her claim for retaliatory discharge, we turn to the discharge claim. [13]

## C. Wrongful Termination Claim

Mahan's complaint separately advanced a claim against Arctic for wrongful termination, alleging that the company violated the Alaska Human Rights Act [14] by firing her on March 16, 2000, in retaliation for opposing Gobaleza's and Harris's earlier acts of sexual harassment. In considering retaliatory discharge claims under the Act, we apply the "distinction between 'pretext' and 'mixed motive' cases" that federal courts use in enforcing the federal Civil Rights Act. [15] Although Mahan advances her retaliatory discharge

claim primarily as a "pretext" case, we will consider her claim under both theories.

■■■ In a pretext case, we apply the same three-part framework used under federal law. [16] First, the plaintiff must establish a prima facie case for retaliatory discharge. To meet this standard, Mahan would need to "show that (1) she engaged in [a protected activity]; (2) her employer subjected her to adverse employment action; [and] (3) there was a causal link between the protected activity and the employer's action. Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." [17] Once the plaintiff establishes a prima facie case, the burden in a pretext case shifts to the employer to show a legitimate, non-retaliatory reason for the discharge. [18] To do so, the employer must produce admissible evidence that would allow a trier of fact to conclude that the employer's decision was not "motivated by discriminatory animus." [19] If the employer offers evidence that rebuts the employee's prima facie case, "the burden of proof shifts back to the employee to show that the employer's explanation is a pretext for retaliation." [20]

■■■ Here, Mahan contends that her evidence established a prima facie case of retaliatory discharge. She maintains that her evidence showed that she engaged in protected activity by refusing Harris's and Go-

11. *Id.*

12. *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 26 (Alaska 2002).

13. Because we conclude in Part III.C below that Mahan presented insufficient evidence to support her retaliatory discharge claim, we need not address the dissent's suggestion that Mahan's wrongful termination might have revived her time-barred sexual harassment claim. *See* Dissent at 666–667. We note only that Mahan has not raised or meaningfully argued this point on appeal.

14. Specifically, AS 18.80.220(a)(4) makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against a person because the person has opposed any practices forbidden under AS 18.80.200–18.80.280 [the Alaska Human Rights Act]."

15. *Era Aviation, Inc. v. Lindfors*, 17 P.3d 40, 43 (Alaska 2000).

16. *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 918 (Alaska 1999) (stating that the three-part framework used in Title VII cases has been adopted for discrimination claims as well as retaliatory discharge claims).

17. *Id.* at 919.

18. *Id.; see also Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 586 (Alaska 2001).

19. *Kinzel v. Discovery Drilling*, 93 P.3d 427, 433 (Alaska 2004) (quoting *VECO, Inc.*, 970 P.2d at 919).

20. *Lincoln*, 30 P.3d at 586–87.

baleza's sexual advances, and that Arctic fired her for engaging in this protected activity. More particularly, Mahan asserted at her deposition that her supervisors at Arctic set her up to be fired by forcing her to work harder than other workers and assigning her to do unpleasant jobs: "It's just the way I was treated. Whenever they looked at me, I was—they piled extra work on my shoulders every time, extra stuff, that the other housekeepers didn't have to do." Mahan theorized that she was treated this way, and was ultimately fired, because of the sexual harassment that had occurred during her first period of employment: "I was terminated because of what happened in the past, at Badami."

Arctic responds that no genuine issue of material fact exists on the issue of pretext, because there was uncontroverted evidence showing that Arctic had legitimate reasons to terminate Mahan's employment and because Mahan failed to produce any evidence tending to show that these reasons were a pretext. Specifically, Arctic points to record evidence demonstrating that Mahan was unable to perform her work because she continually broke out in a rash when she handled laundry. Arctic also points to undisputed evidence that Mahan received verbal reprimands for fighting with other workers. According to Arctic, this evidence gave Mahan the burden of offering proof that her firing was actually a pretext—a burden that, in Arctic's view, Mahan failed to carry.

Arctic's argument is persuasive. As an initial matter, we note that Mahan's own testimony leaves little dispute as to the existence of facially legitimate, non-retaliatory reasons for her termination. Mahan herself acknowledged that she had developed a rash on her arms that precluded her from doing the work she had been told to do in the laundry. She further acknowledged having problems meeting her supervisors' demands—"I had five bosses that [were] trying to tell me what to do, and ... just—I couldn't handle it." And she admitted that

during her short tenure at Alpine camp she received two verbal reprimands for fighting with other workers.

■ Because Arctic supported its summary judgment motion with ample evidence of legitimate, non-discriminatory reasons for Mahan's discharge, Mahan had the burden of producing admissible evidence sufficient to raise a genuine issue of fact supporting her theory that these reasons were merely a pretext.[21] Mahan's burden required her to offer something more than "unsupported assumptions and speculation."[22] In *French v. Jadon, Inc.*, for example, we held that summary judgment was appropriate when an employer produced evidence showing that it fired its employee because she was unreliable, and the employee responded by presenting nothing more than her own subjective belief that the employer's asserted ground for her firing was merely a pretext.[23]

Here, as in *French*, the claim of pretext is based on nothing more than the claimant's "unsupported assumptions and speculation."[24] Relying on her deposition testimony, Mahan asserts that Arctic gave her extra work and then used her inability to handle the workload as a pretext to fire her: Arctic's actual motive, Mahan insists, was to get back at her for refusing to have sex with Gobaleza and Harris in 1999. But while Mahan offered her subjective opinion that she had been treated unfairly, she presented no solid evidence to show that she actually received unusually burdensome and unequal work. Mahan testified that her supervisors "piled work on [her] shoulders"; and she expressed the conclusory view that she had not been hired to do the work she was given. But she provided no factual details to flesh out these bare allegations; she described no concrete examples of conduct by Arctic to substantiate her perception that she received more work than other housekeepers; and she presented no other factual information tending to show that other housekeepers got better treatment.

**21.** *McGlothlin v. Municipality of Anchorage,* 991 P.2d 1273, 1277 (Alaska 1999).

**22.** *French,* 911 P.2d at 25.

**23.** *Id.*

**24.** *Id.*

More important, Mahan offered nothing but her own subjective, after-the-fact impressions to establish the link that she assumed must have existed between her extra workload and the prior sexual harassment. At her deposition, Mahan gave no testimony suggesting a close temporal or other logical link between her firing in March 2000 and the protected ·conduct that she herself claimed to be the cause of Arctic's retaliation—her resistence to Gobaleza's and Harris's sexual advances the year before at Badami. She insisted that she "believe[d]" that what happened in Badami "had a lot to do with" her firing; and she said that she "guess[ed]" that her presence at Alpine must have reminded Gobaleza and Harris of what had happened a year before at Badami. Yet when pressed to say why she believed this, Mahan simply responded, "Because I just do." When asked how the supervisors who actually fired her at Alpine knew of the sexual harassment that occurred the previous year at Badami, Mahan replied, "Apparently, [Harris and Gobaleza] must have talked to them. I don't know." At the same time, Mahan readily acknowledged, "Maybe I'm wrong."

Although Mahan did describe one specific incident in 2000 that she apparently viewed as sexually harassing—the incident in which Gobaleza greeted her with a hug upon first seeing her back on the job at Alpine—she did not claim that this incident prompted her to take any action that could reasonably be construed as protected conduct—conduct such as resisting Gobaleza's efforts to hug her or reporting his actions to her supervisors. Absent some evidence that Gobaleza's hug prompted Mahan to engage in protected conduct, the temporal connection between this recent act of sexual harassment and her ensuing firing would not alone provide a logical basis to suggest that her firing was a retaliatory measure: "[C]ausation sufficient to establish a prima. facie case of unlawful retaliation may be inferred from the proximi-

ty in time between *the protected activity* and the allegedly retaliatory discharge." [25] According to Mahan's evidence, her most recent protected conduct allegedly occurred at Badami, a full year before she was fired.

On this record, we conclude that the superior court properly granted summary judgment to Arctic on Mahan's claim of pretextual discharge because, in response to uncontroverted evidence of Arctic's legitimate reasons to fire her, Mahan failed to offer anything more than "unsupported assumptions and speculation" to establish her theory of pretext.[26]

■ Mahan's failure to meet her burden under the pretext framework does not necessarily defeat her retaliatory discharge claim, since she could conceivably still prevail on a "mixed-motive" theory by showing that, even if Arctic's legitimate reasons were not completely pretextual, its actions were nonetheless substantially motivated by a desire for retaliation. Yet under the facts presented here Mahan's claim fares no better as a mixed-motive case than it does under a pretext theory. Under federal case law, mixed-motive cases require the plaintiff to "clear[ ] the initial hurdle of presenting direct evidence of discriminatory intent." [27] In *Kinzel v. Discovery Drilling,* we declined to strictly apply the federal "direct evidence" requirement; yet we nonetheless held that a plaintiff in a mixed-motive case must at least offer either direct evidence of prohibited motivation or circumstantial evidence strong enough to be functionally equivalent to direct proof.[28]

■ To meet this burden, the plaintiff in a mixed-motive case must present evidence of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting on the discriminatory attitude." [29] If that evidence "is sufficient to permit the factfinder to infer that [the discrimination] was more likely than not a motivating factor in the employ-

25. *Kinzel,* 93 P.3d at 433 (emphasis added).

26. *French,* 911 P.2d at 25.

27. *Era Aviation,* 17 P.3d at 44.

28. *Kinzel,* 93 P.3d at 434.

29. *Id.* at 435 (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182–83 (2d Cir.1992) (citation omitted)).

er's decision," then the plaintiff may recover "unless the employer [can] establish[ ] by a preponderance of the evidence that [it] would have taken the same action without consideration of the impermissible [discrimination.]"[30] In a mixed-motive case, then, the claimant must go beyond establishing the existence of a potential retaliatory motive by adducing strong evidence—evidence akin to direct proof—that tends to establish the improper motive's substantial contributing role.

Here, as our discussion of Mahan's pretext theory shows, Mahan offered neither direct nor strong circumstantial evidence suggesting that Arctic actually fired her for retaliatory reasons. At most, she presented a theory of retaliation based on subjective belief and an attenuated circumstantial chain of events. She insisted that she was fired from her job at Alpine camp in March 2000 for engaging in protected conduct that occurred the year before at Badami camp, yet she identified no specific "conduct or statements by persons involved in the decisionmaking process"[31] to support her contention. As already noted, she offered only her own subjective belief: When asked whether Arctic fired her because of her refusal to have sex with Harris and Gobaleza at the Badami camp in 1999, Mahan responded, "I believe it had a lot to do with it; maybe I'm wrong, but I believe it did."

We see no arguable basis on this record for concluding that Mahan's beliefs concerning Arctic's retaliatory animus amounted to "sufficiently strong" circumstantial evidence to raise a genuine dispute of material fact under *Kinzel's* standard for a mixed-motive claim.

## IV. CONCLUSION

We thus AFFIRM the superior court's order granting summary judgment to Arctic.

FABE, J., with whom CARPENETI, J., joins, dissents.

FABE, Justice, with whom CARPENETI, Justice, joins, dissenting.

I disagree with the court's conclusions that Mahan has failed to raise a genuine issue of material fact on her claim of wrongful termination and that her hostile work environment claim is time-barred. As the court correctly notes, all inferences must be drawn in favor of Mahan, as the non-moving party.[1] Yet the court's decision credits Arctic's version of the facts and its argument that Mahan's termination stemmed from her failure to "perform her work because she continually broke out in a rash when she handled laundry."[2] If Mahan's deposition testimony and her responses to interrogatories are viewed in the light most favorable to her, one must conclude that she has raised a genuine issue of material fact on the question whether her termination was retaliatory. Viewed in the light most favorable to Mahan, the evidence suggests that her supervisors assigned her tasks in the laundry room—with the knowledge that these were outside her normal duties and that she was allergic to laundry soap—in order to punish her, and that this retaliatory conduct led to her termination. Furthermore, Mahan has made a convincing argument that her otherwise untimely hostile environment claim has been revived by her termination under the continuing violations doctrine. I would therefore reverse the superior court's grant of summary judgment and permit Mahan to proceed on both her wrongful termination and hostile environment claims.

## I. The Evidence Presented by Mahan Raises a Genuine Issue of Material Fact.

Mahan's argument is that both Harris and Gobaleza sexually harassed her while she was at Badami. According to Mahan's responses to interrogatories, Gobaleza would come into the restroom when Mahan was cleaning and use the urinal in front of her. Both Gobaleza and Harris came into her room at night "to the point where [she] had

---

**30.** *Id.*

**31.** *Id.*

**1.** *See K & K Recycling, Inc. v. Alaska Gold Co.,* 80 P.3d 702, 711 (Alaska 2003); *R.E. v. State,* 878 P.2d 1341, 1345 (Alaska 1994).

**2.** 133 P.3d at 660.

to prop a chair against the door, because [she] wasn't getting enough rest at night." Each man asked Mahan to have sex with him and when Mahan's supervisor, Doug Schneider, observed Gobaleza's conduct, he said "that's considered sexual harassment" and told Gobaleza to leave Mahan alone. Schneider told Mahan she was a good employee, "the best one they had."

When Mahan was rehired to work for Arctic at the Alpine camp, she claims that Gobaleza continued the harassment and "rubbed his hand down by [her] bra strap, when he went to give a hug." Mahan also believed that at Alpine, Harris evidenced residual resentment of her action in reporting him for the sexual harassment at Badami. According to Mahan's deposition testimony, submitted in support of her opposition to the motion for summary judgment, when Harris arrived at Alpine, he "piled work on [Mahan's] shoulders every time, extra stuff, that the other housekeepers didn't have to do."

Mahan also testified that at Alpine, she "wasn't assigned to do laundry; [she] was assigned to do the bedrooms and the bathrooms and stuff." She insisted that she "was supposed to make beds, do bathrooms, and only the laundry that was in the bedrooms.... Not work ... in the laundry room." She maintained: "I did the duties of [the] position I was hired for. I was not hired to work in the laundry room." She claims that she "wasn't treated like the other housekeepers," and was given "a tremendous amount" of extra work by Harris. She also claims that Harris "was [at Alpine] the day [she] was fired from [her] job up there."

Thus, the court's assertion that there are "facially legitimate, non-retaliatory reasons for her termination" because the rash on Mahan's arms "precluded her from doing the work she had been told to do in the laundry"[3] does not give Mahan the benefit of her testimony that she was not assigned to work in the laundry and that she was being given

inappropriate duties by Harris due to her protected activity of resisting his sexual advances. Moreover, although Arctic offered evidence that it fired Mahan due to her inability to perform laundry duties, Mahan's evidence that she was not hired to do laundry and that she was given extra duties as retaliation for her earlier claims of harassment were "more than 'unsupported assumptions and speculation.' "[4]

Finally, although the court concludes that there is no strong chronological connection between Mahan's firing in March 2000 and the protected conduct in 1999 of resisting the sexual advances of Gobaleza and Harris at Badami, Mahan stated that sexual harassment occurred at Alpine as well as Badami. In her answers to interrogatories, she stated that "Mr. Harris asked Ms. Mahan to have sex with him at Alpine *and* Badami on repeated occasions during her tenure." (Emphasis added.) She also responded that Harris "made the following comment to me at Alpine[:] 'You sure have a cute ass. I wish I could have a piece of that.' " She claimed that Gobaleza inappropriately rubbed his hand down her bra strap when he gave her a hug at Alpine. Her claim of sexual harassment at Alpine thus establishes a chronological connection between her firing and the protected conduct.

## II. This Case Is Distinguishable from *French v. Jadon, Inc.*

The court relies on *French v. Jadon, Inc.*[5] for the proposition that Mahan must offer more than "her own subjective impressions" to establish a link between the alleged sexual harassment and her subsequent firing. But Mahan's case is distinguishable from *French* because, unlike the plaintiff in *French,* Mahan points to specific instances of sexual advances at both camps, and she asserts that one of her alleged harassers was among those who assigned her extra work at Alpine.[6] As noted above, Mahan alleges in her

3.   133 P.3d at 661.

4.   133 P.3d at 661.

5.   911 P.2d 20 (Alaska 1996).

6.   *See id.* at 27, 29 & n. 16 (noting that plaintiff "produced no evidence of any statement or action reasonably permitting an inference that her employment was in fact conditioned on dating her supervisor's brother" to support her quid pro quo harassment claim and observing that plain-

affidavit that Gobaleza and Harris made sexual advances toward her at both camps, that Harris assigned her "a tremendous amount" of extra work at Alpine, and that Harris "was [at Alpine] the day [she] was fired from [her] job up there." Whether this evidence would ultimately persuade a jury is unclear, but it certainly amounts to more than just Mahan's own subjective impressions.

## III. The High Evidentiary Threshold that the Court Applies Here Is Inconsistent with Recent Case Law.

Our many decisions on the standard for summary judgment prevent us from weighing the evidence relied on by a non-moving party in opposition to summary judgment.[7] Thus, our role at this stage is not to decide whether Mahan has a strong case for retaliatory discharge; it is merely to decide if she has raised a genuine issue of material fact. As we have held repeatedly, "the evidentiary threshold necessary to preclude an entry of summary judgment is low." [8]

Two recent decisions, neither of which the court attempts to distinguish, indicate just how low. In *Cikan v. ARCO Alaska, Inc.,* this court reversed a superior court's grant of summary judgment to the defendant in a slip-and-fall action brought eight and a half years after the alleged injury.[9] The court held that there was a genuine issue of material fact as to whether the plaintiff had been rendered incompetent by the accident, thereby tolling the statute of limitations.[10] But the evidence of Cikan's mental incompetence

during the two-year statute of limitations [11] was far less substantial than Mahan's evidence in the present case. Cikan's medical expert "did not state that [she] was mentally incompetent or incapable of understanding her legal rights from the date of injury ... until the running of the statute [two years later]"; [12] the testimony of lay witnesses relied upon by the court focused on Cikan's incompetency after the expiration of the statute of limitations (rather than during the time that she should have been filing a lawsuit); [13] and one of these witnesses testified that Cikan "appeared to have her life together" six months after the accident.[14] Nevertheless, the court held that the evidence raised a genuine issue of material fact.

And in *Meyer v. State, Department of Revenue, Child Support Enforcement Division ex rel. N.G.T.,*[15] the court held that a putative father's sworn denial that he engaged in sexual intercourse with the child's mother at the time of conception was sufficient to preclude the entry of summary judgment in a child support action, even though the record included a genetic test indicating a 99.98% probability that he was the father.[16] The sworn denial, which was the only evidence presented against paternity, was not even unequivocal: Meyer admitted that he was "unable to recall the precise dates, times of day, locations and circumstances surrounding each [sexual] contact that [he] ... had with [the child's mother]." [17] The *Meyer* court recognized "the significant statistical odds

---

tiff could not point to any specific events to support her hostile work environment claim).

**7.** See *Cabana v. Kenai Peninsula Borough,* 50 P.3d 798, 801 (Alaska 2002) ("The court does not weigh the evidence or witness credibility on summary judgment."); *Alakayak v. British Columbia Packers, Ltd.,* 48 P.3d 432, 449 (Alaska 2002) (same); *Moffatt v. Brown,* 751 P.2d 939, 944 (Alaska 1988) (rejecting summary judgment standard for defamation used by federal courts because it incorporated a substantive evidentiary standard, "inevitably implicat[ing] a weighing of the evidence") (internal citations omitted).

**8.** *Hammond v. State, Dep't of Transp. & Pub. Facilities,* 107 P.3d 871, 881 (Alaska 2005) (quoting *John's Heating Serv. v. Lamb,* 46 P.3d 1024, 1032 (Alaska 2002)).

**9.** *Cikan v. ARCO Alaska, Inc.,* 125 P.3d 335 (Alaska 2005).

**10.** *Id.*

**11.** *Id.* at 658 n. 8 (citing AS 09.10.070 (providing that lawsuits based on statutory causes of action must be brought within two years)).

**12.** *Id.* at 663 (Fabe, J., dissenting).

**13.** *Id.*

**14.** *Id.*

**15.** 994 P.2d 365 (Alaska 1999).

**16.** *Id.* at 368.

**17.** *Id.* at 369 (Fabe, J., dissenting).

suggesting Meyer's paternity," but held that "Meyer's denial is sufficient to create a genuine factual issue despite the scientific evidence.". Given the low threshold necessary to preclude entry of summary judgment set by this court in *Cikan* and *Meyer*, Mahan's stronger evidentiary showing is certainly sufficient to defeat Arctic Catering's motion for summary judgment.

## IV. Departing from Our Prior Cases To Set a Higher Threshold Is Likely To Discourage Meritorious Discrimination Claims.

By failing to apply consistently our summary judgment standard, the court not only creates a conflict with existing case law, but also sets a precedent that could deter meritorious claims in the future. Discrimination cases, including claims of harassment and wrongful termination, "often turn on subtle questions of credibility and intent that only a factfinder faced with a live witness should decide."[18] The evidence in these cases, which may consist primarily of the testimony of the alleged victim and the alleged perpetrator, is likely to contain conflicting claims, and is likely to be susceptible to different interpretations, depending on which inferences the factfinder draws. For this reason, discrimination claims—including claims that might prevail if allowed to proceed—are particularly vulnerable to summary judgment if courts improperly weigh the credibility of evidence, fail to draw reasonable inferences in favor of the non-moving party, or decide outright the ultimate questions of fact. As several scholars have noted, this makes it significantly more difficult for victims of discrimination to seek redress, even when the law grants them a cause of action.[19] Thus, by deterring meritorious discrimination claims, the court's departure from precedent is likely to have pernicious effects that go far beyond this particular case.

## V. Mahan's Hostile Environment Claim Should Be Permitted To Proceed.

Because Mahan has brought forth sufficient evidence to prevent summary judgment on her claim of retaliatory discharge, she should also be permitted to proceed with her hostile environment claim. We have held that "certain patterns of discriminatory acts against the same employee can preserve a claim as timely that might otherwise be barred by the statute of limitations."[20] As the court correctly notes, a plaintiff seeking to preserve otherwise-barred claims "must first demonstrate that some discriminatory act occurred within the limitations period [and] ... must then show that the timely filed claim—based upon this act within the limitation period—is closely related to the otherwise time-barred claims."[21] To determine whether the claims are sufficiently related, we look to "three primary characteristics of the violations: subject matter, temporal proximity, and permanence,"[22] with permanence being the most important of the three.[23] A " 'permanent' violation triggers a reasonable person's awareness of

**18.** Ann C. McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases*, 34 B.C. L.Rev. 203, 208 (1993).

**19.** *See, e.g.,* M. Isabel Medina, *A Matter of Fact: Hostile Environments and Summary Judgments*, 8 S. Cal. Rev. L. & Women's Stud. 311, 357–71 (1999) (arguing that the practice of deciding certain factual questions, such as whether the plaintiff experienced a hostile work environment, at the summary judgment stage makes it unnecessarily difficult for plaintiffs to bring sexual harassment claims); Ann C. McGinley, *supra* note 18, at 241–42 (noting that "many courts approaching a summary judgment motion in a civil rights case ... require a plaintiff to prove that [he or] she was discriminated against," which effectively "shift[s] the burden of proof on a motion for summary judgment from the moving party to the plaintiff," and "require[s] the plaintiff to meet the ultimate burden of proof at the summary judgment stage"); *see also* Jana E. Cuellar, *The Age Discrimination in Employment Act: Handling the Element of Intent in Summary Judgment Motions*, 38 Emory L.J. 523, 532–37 (1989) (noting similar problems in the context of age discrimination actions).

**20.** *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1249 (Alaska 2001); *see also Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 26 (Alaska 2002).

**21.** *Sengupta*, 21 P.3d at 1249; 133 P.3d at 659–660.

**22.** *Sengupta*, 21 P.3d at 1249.

**23.** *Id.*

the alleged discrimination and the need to assert [his or] her rights."[24]

Federal case law, although not entirely clear on this point, does not appear to preclude a claim of retaliatory termination from reviving a hostile environment claim.[25] Because Mahan does allege a "hostile environment," the court should apply the three factors for determining whether the continuing violations doctrine revives her sexual harassment claims.[26] If Mahan was given work that she was physically unable to do in retaliation for her complaints about sexual harassment, as the evidence suggests, her termination for inability to do that work is clearly related to the previous incidents of sexual harassment. Similarly, given the evidence that sexual harassment occurred at the second camp as well as the first, which implies that the alleged harassment happened within days of her termination, the harassment and termination were proximate in time. Finally, her termination was permanent, in that it would "trigger[ ] a reasonable person's awareness of the alleged discrimination and [of] the need to assert [his or] her rights."[27] I therefore believe that, based on the evidence that Mahan has presented, she should be permitted to proceed with her hostile environment claim as well as her wrongful termination claim.

## VI. Conclusion

In sum, Mahan has unequivocally alleged harassment and wrongful retaliation, and has presented evidence that easily surmounts the low threshold required to withstand a motion for summary judgment. Affirming the grant of summary judgment in this case is a departure from our recent precedents. And the court's decision today is likely to deter meritorious civil rights actions in the future. Furthermore, because Mahan has made a showing of a discriminatory act within the statute of limitations that is closely related to the acts underlying her hostile environment claim, she should be permitted to proceed with her hostile environment claim as well. I therefore respectfully dissent.

---

24. *Id.*

25. The United States Supreme Court has held that certain discriminatory acts, including "termination, failure to promote, denial of transfer, or refusal to hire" are "[d]iscrete acts," and that an untimely claim for a discrete act cannot be revived through the doctrine of continuing violations. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that discrete discriminatory acts are not actionable under Title VII if the statute of limitations for these acts has expired, even if they are related to other acts that are the subject of a timely claim). But *Morgan* did not hold that *other* claims cannot be revived by a discrete discriminatory act, and *Morgan* did conclude that the continuing violations doctrine applies to hostile environment claims. *See id.* at 115–16, 122 S.Ct. 2061. To the extent that Mahan alleges a series of incidents that, taken together, create a hostile work environment, the

assertion that the discrete act of her termination revived the original claim does not appear to be inconsistent with the holding of *Morgan*.

Furthermore, at least one state court has declined to adopt the reasoning of *Morgan* even as it applies to reviving discrete acts. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 32 Cal. Rptr.3d 436, 116 P.3d 1123, 1141–42 (2005) (holding that the continuing violations doctrine can revive acts that are part of a "retaliatory course of conduct," even if such acts could not be revived under federal law).

26. *See Reich*, 56 P.3d at 26 ("The continuing violations doctrine allows a plaintiff to establish the elements of a hostile work environment claim by relying on incidents that predate the statutory limitations period to prove that a hostile environment continued into the limitations period.").

